IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| AJI P., a minor child by and through his guardian HELAINA PIPER; ADONIS W., a minor child, by and through his guardian HELAINA PIPER; WREN W., a minor child by and through her guardian MIKE WAGENBACH; LARA F. & ATHENA F., minor children by and through their guardian MONIQUE DINH; GABRIEL M., a minor child by and through his guardians VALERY and RANDY MANDELL; JAMIE M., a minor child by and through her guardians MARK and JANETH MARGOLIN; INDIA B., a minor child by and through her guardians, JIM BRIGGS and MELISSA BATES; JAMES CHARLES D., a minor child by and through his guardian DAWNEEN DELACRUZ; KYLIE JOANN D., a minor child, by and through her guardian DAWNEEN DELACRUZ; KAILANI S., a minor child, by and through her guardian, JOHN SIROIS; DANIEL M., a minor child, by and through his guardian, FAWN SHARP; and BODHI K., a minor child, by and through his guardian MARIS ABELSON,<br><br>     Appellants,<br><br>    v.<br><br>STATE OF WASHINGTON; JAY INSLEE, in his official capacity as Governor of Washington; WASHINGTON DEPARTMENT | No. 80007-8-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION |

Citations and pin cites are based on the Westlaw online version of the cited material.

OF ECOLOGY; MAIA BELLON, in her official capacity as Director of the WASHINGTON DEPARTMENT OF ECOLOGY; WASHINGTON DEPARTMENT OF COMMERCE; BRIAN BONLENDER, in his official capacity as Director of the WASHINGTON DEPARTMENT OF COMMERCE; WASHINGTON STATE TRANSPORTATION COMMISSION; WASHINGTON DEPARTMENT OF TRANSPORTATION; and ROGER MILLER, in his official capacity as Secretary of the WASHINGTON DEPARTMENT OF TRANSPORTATION,

Respondents.

SMITH, J. – The appellants are 13 youths (the Youths) between the ages of 8 and 18 who sued the State of Washington, Governor Jay Inslee, and various state agencies and their secretaries or directors (collectively the State) seeking declaratory and injunctive relief.  The Youths alleged that the State "injured and continue[s] to injure them by creating, operating, and maintaining a fossil fuel-based energy and transportation system that [the State] knew would result in greenhouse gas ("GHG") emissions, dangerous climate change, and resulting widespread harm."  To this end, the Youths asserted substantive due process, equal protection, and public trust doctrine claims, among others.  They asked the trial court to declare that they have "fundamental and inalienable constitutional rights to life, liberty, property, equal protection, and a healthful and pleasant environment, which includes a stable climate system that sustains human life and

2

liberty." They further requested that the court "[o]rder [the State] to develop and submit to the Court . . . an enforceable state climate recovery plan," and that it "[r]etain jurisdiction over this action to approve, monitor and enforce compliance" therewith.

We firmly believe that the right to a stable environment should be fundamental. In addition, we recognize the extreme harm that greenhouse gas emissions inflict on the environment and its future stability. However, it would be a violation of the separation of powers doctrine for the court to resolve the Youths' claims. Therefore, we affirm the superior court's order dismissing the complaint.

## BACKGROUND

Climate change poses a very serious threat to the future stability of our environment. Washington experienced the hottest year on record in 2020, and "'climate extremes like floods, droughts, fires and landslides are . . . affecting Washington's economy and environment.'" The parties to this case and this court readily acknowledge the fact that the federal and state governments must act now to address climate change. The Washington State Department of Ecology (Ecology) said in December 2014, "Climate change is not a far off-risk. It is happening now globally[,] and the impacts are worse than previously predicted, and are forecast to worsen."[1] It concluded that "[i]f we delay action by

---

[1] WASH. DEP'T OF ECOLOGY, WASHINGTON GREENHOUSE GAS EMISSION REDUCTION LIMITS: PREPARED UNDER RCW 70.235.040, at vi (Dec. 2014), https://apps.ecology.wa.gov/publications/documents/1401006.pdf [https://perma.cc/VYA3-GT3E].

even a few years, the rate of reduction needed to stabilize the global climate would be beyond anything achieved historically and would be more costly."[2] According to the *Joint Statement on "Human Rights and Climate Change"* (Joint Statement) signed by five United Nations human rights bodies, "[t]he adverse impacts identified in the [2018 Intergovernmental Panel on Climate Change (IPCC)] report[ ] threaten, among others, the right to life, the right to adequate food, the right to adequate housing, the right to health, the right to water and cultural rights."[3] "The risk of harm is particularly high for those segments of the population already [marginalized] or in vulnerable situations[,] . . . such as women, children, persons with disabilities, indigenous peoples and persons living in rural areas."[4] "The IPCC report makes it clear that to avoid the risk of irreversible and large-scale systemic impacts, urgent and decisive climate action is required."[5] Prompted by this knowledge, groups of determined youths around the United States have sought dramatic and necessary climate change action from their executive and legislative branches. When unsatisfied with the results, they have sought redress in the courts.

## FACTS

In February 2018, the Youths filed a complaint against the State, Governor

---

[2] Id.

[3] Comm. on Elimination of Discrimination Against Women et al., Joint Statement on "Human Rights and Climate Change," UNITED NATIONS HUM. RTS. OFF. OF HIGH COMMISSIONER (Sept. 16, 2019), https://www.ohchr.org/en/NewsEvents/Pages/DisplayNews.aspx?NewsID=24998&LangID=E [https://perma.cc/C23Q-TJYZ].

[4] Id.

[5] Id.

Inslee, Ecology, the Washington State Department of Commerce, the Washington State Department of Transportation, and the agencies' directors and secretaries. The Youths detailed the harmful and dire effects of climate change, including serious threats to India B.'s [6] family farm, to salmon populations that Wren W. considers "a source of spiritual and recreational beauty," and to James Charles D. and Kylie JoAnn D.'s home in the Taholah lower village of the Quinault Indian Nation.

The Youths presented six claims for relief: (1) violation of their substantive due process rights to "[a] stable climate system, . . . an essential component to [their] rights to life, liberty, and property," (2) violation of their substantive due process rights under the state-created danger doctrine, (3) violation of their "[f]undamental [r]ight to a [h]ealthful and [p]leasant [e]nvironment" under RCW 43.21A.010 and article I, section 30 of the state constitution, (4) violation of the public trust doctrine by "substantial impairment to essential Public Trust Resources" through "[h]arm to the atmosphere[, which] negatively affects water, wildlife, and fish resources," (5) violation of their right to equal protection under article I, section 12 of the state constitution "as young people under the age of 18," who the Youths contend "are a separate suspect and/or quasi-suspect class," and (6) challenges to the constitutionality of RCW 70.235.020(1)(a) and RCW 70.235.050(1)(a)-(c).[7]

---

[6] Consistent with the parties' briefing at the trial court and on appeal, we refer to the Youths by their first name and the initial of their last name.

[7] The Youths withdrew the appeal of their sixth claim for relief following recent legislative amendments.

The Youths asked the court to declare that they "have fundamental and inalienable constitutional rights to life, liberty, property, equal protection, and a healthful and pleasant environment, which includes a stable climate system that sustains human life and liberty." They alleged that the State placed them "in a position of danger with deliberate indifference to their safety in a manner that . . . violates [their] fundamental and inalienable constitutional rights to life, liberty, and property." Additionally, the Youths requested that the court

> [o]rder Defendants to develop and submit to the Court by a date certain an enforceable state climate recovery plan, which includes a carbon budget, to implement and achieve science-based numeric reductions of GHG emissions in Washington consistent with reductions necessary to stabilize the climate system and protect the vital Public Trust Resources on which Plaintiffs now and in the future will depend;
> . . . [and r]etain jurisdiction over this action to approve, monitor and enforce compliance with Defendants' Climate Recovery Plan and all associated orders of this Court.

While acknowledging that the threats of climate change are serious, the State moved for judgment on the pleadings under CR 12(c), contending that the Youths' claims and requested relief violated the separation of powers doctrine, were nonjusticiable under the Uniform Declaratory Judgments Act (UDJA), chapter 7.24 RCW, and should have been brought under the Administrative Procedure Act (APA), chapter 34.05 RCW.

In its detailed order granting the State's motion, the superior court held that the Youths' claims were nonjusticiable, that there is no fundamental constitutional right to "a clean" or "'healthful and pleasant environment,'" that the Youths did not present a cognizable claim under the equal protection clause, and that, "[f]or the reasons stated in [the State's] motion and reply memorandum, all

6

of [the Youths'] other claims must be dismissed."  The Youths appeal.

ANALYSIS

Standard of Review

We review a CR 12(c) motion for judgment on the pleadings de novo and "'identically to a CR 12(b)(6) motion'" to dismiss.  Wash. Trucking Ass'ns v. Emp't Sec. Dep't, 188 Wn.2d 198, 207, 393 P.3d 761 (2017) (quoting P.E., Sys., LLC v. CPI Corp., 176 Wn.2d 198, 203, 289 P.3d 638 (2012)).  "Dismissal under either subsection is 'appropriate only when it appears beyond doubt' that the plaintiff cannot prove any set of facts that 'would justify recovery.'"  Wash. Trucking, 188 Wn.2d at 207 (quoting San Juan County v. No New Gas Tax, 160 Wn.2d 141, 164, 157 P.3d 831 (2007)).  To this end, "[a]ll facts alleged in the complaint are taken as true, and we may consider hypothetical facts supporting the plaintiff's claim."  FutureSelect Portfolio Mgmt., Inc. v. Tremont Grp. Holdings, Inc., 180 Wn.2d 954, 962, 331 P.3d 29 (2014).  In addition, "[c]onstitutional questions are questions of law and are subject to de novo review."  In re Det. of Morgan, 180 Wn.2d 312, 319, 330 P.3d 774 (2014).

Separation of Powers Doctrine

The Youths contend that the trial court erred in concluding that their claims presented nonjusticiable political questions.  Because the Youths' claims inevitably involve resolution of questions reserved for the legislative and executive branches of government, we disagree.

"The nonjusticiability of a political question is primarily a function of the separation of powers."  Baker v. Carr, 369 U.S. 186, 210, 82 S. Ct. 691, 706, 7 L.

7

Ed. 2d 663 (1962). "Separation of powers create[s] a clear division of functions among each branch of government, and the power to interfere with the exercise of another's functions [is] very limited." Hale v. Wellpinit Sch. Dist. No. 49, 165 Wn.2d 494, 504, 198 P.3d 1021 (2009). "The judicial branch violates the doctrine when it assumes 'tasks that are more properly accomplished by [other] branches.'" Id. at 506 (alteration in original) (internal quotation marks omitted) (quoting Carrick v. Locke, 125 Wn.2d 129, 136, 882 P.2d 173 (1994)).

"Prominent on the surface of any case held to involve a political question is" (1) "a textually demonstrable constitutional commitment of the issue to a coordinate political department," (2) "a lack of judicially discoverable and manageable standards for resolving it," (3) "the impossibility of" resolving a claim "without an initial policy determination of a kind clearly for nonjudicial discretion," or (4) "the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government" through, for example, failing to attribute "finality to the action of the political departments." Baker, 369 U.S. at 217, 210. In our review of these factors, we must complete a "discriminating inquiry into the precise facts and posture of the particular case." Id. at 217.

Here, the Youths' claims ask us to address whether the State's current GHG emissions statutes and regulations sufficiently address climate change.[8]

---

[8] The Youths "do not claim that any *individual* agency action exceeds statutory authorization or, *taken alone*, is arbitrary and capricious." See Juliana v. United States (Juliana II), 947 F.3d 1159, 1167 (9th Cir. 2020) (emphasis added). Rather, the Youths' claims for relief challenge "the affirmative aggregate acts of" the State and its agencies. Therefore, contrary to the State's contention,

The Youths request that the State be required to achieve a 96 percent reduction of carbon dioxide ($CO_2$) emissions by 2050, "transition almost completely off of natural gas and gasoline and diesel fuel within the next 15 years," and "generate 90% of its electricity from carbon-free sources by 2030." We assume—for this section's analysis only—that the Youths have a fundamental right to a healthy and pleasant environment. See, e.g., Juliana v. United States (Juliana II), 947 F.3d 1159, 1169-70 (9th Cir. 2020) (assuming that the plaintiffs' asserted constitutional rights existed for the purpose of analyzing redressability). However, even assuming there is such a right, the Baker factors lead to the conclusion that the question posed inevitably requires determination of a nonjusticiable political question.

First, the resolution of the Youths' claims is constitutionally committed to the legislative and executive branches. "'Article 2, section 1, of the Washington State Constitution vests all legislative authority in the legislature and in the people,' through the power of initiative and referendum." Nw. Animal Rights Network v. State, 158 Wn. App. 237, 245, 242 P.3d 891 (2010) (quoting In re Chi-Dooh Li, 79 Wn.2d 561, 577, 488 P.2d 259 (1971)). To provide the Youths' requested relief, we would be required to order the executive branch, through the power vested in it by the legislature, and the legislative branch to create and implement legislation, or, as the Youths call it, a "climate recovery plan." For all intents and purposes, we would be writing legislation and requiring the legislature to enact it. But we cannot force the legislature to legislate, and we cannot

---

the Youths were not required to bring their claims under the APA.

9

legislate ourselves. In short, resolving the Youth's claims would require the judiciary to legislate, in contravention of the textually demonstrable constitutional commitment of the legislative power to the legislative branch and to the people.

Second, there is no judicially manageable standard by which we can resolve the Youths' claims. The Youths' climate recovery plan includes "a carbon budget[ ] to implement and achieve science-based numeric reductions of GHG emissions in Washington consistent with reductions necessary to stabilize the climate system." But as the Youths acknowledge, scientific expertise is required to make a determination regarding appropriate GHG emission reductions, and the determination necessarily involves including all stakeholders and balancing the many implicated and varied interests affected by any GHG emission reduction policies. To this end, the agencies employ and retain climate scientists from the University of Washington to assist with their policy determinations. Were we to make these determinations, we would decide matters beyond the scope of our authority with resources not available to the judiciary. Accordingly, we cannot imagine a judicially manageable standard available to create and enforce the Youths' asserted right, the related claims, or the extension of the public trust doctrine to the atmosphere.

Third, the legislature and the agency respondents have already made an initial policy determination concerning the Youths' claims, pursuant to their constitutionally and statutorily prescribed authority, and they created a regulatory regime on that basis. The Youths ask us to discern and provide the State with "the maximum safe level of $CO_2$ concentrations and the timeframe in which that

10

level must be achieved – and leave to Respondents the specifics of developing and implementing a compliant plan." But the political branches have already made this policy determination: Ecology recently enacted its final clear air rule, chapter 173-442 WAC, which regulates GHG emissions, following an extensive analysis and utilizing all of the resources available to it, including public comment and the work of renowned climate scientists. And despite the Youths' assertions to the contrary,[9] we cannot create a regulatory regime to replace one already enacted by the legislature and state agencies without an initial policy determination of a kind clearly for nonjudicial discretion.

Finally, resolution of any of the Youths' claims involves disrespecting the coordinate branches. In particular, the Youths asked the trial court to "[r]etain jurisdiction over this action to approve, monitor and enforce compliance with Defendants' Climate Recovery Plan and all associated orders of this Court." Such action by the court necessarily involves policing the legislative and executive branches' policymaking decisions and, thus, inherently usurps those

---

[9] The Youths assert both that they did not request that we impose a regulatory regime and that we can impose one. As to the latter assertion, case law says otherwise. See, e.g., Nw. Animal Rights Network, 158 Wn. App. at 245 (declining to disturb the legislature's determination that certain activities are not abhorrent to our society and therefore legal); Nw. Greyhound Kennel Ass'n, Inc. v. State, 8 Wn. App. 314, 319, 321, 506 P.2d 878 (1973) (declining to rule on whether a statutory scheme forbidding parimutuel dog racing violates the equal protection clause because doing so would require resolution of "a political question in an area of almost complete legislative discretion"); Rousso v. State, 170 Wn.2d 70, 87-88, 239 P.3d 1084 (2010) (dealing with a dormant commerce clause issue pertaining to online gambling, but finding that Rousso's suggestion that "the court force the legislature to trust in the regulatory systems of other countries" and dismantle the State's current regulatory scheme "bulldozes any notion of a separation of powers between the judiciary and the legislature"). And with regard to the former, the Youths' complaint says otherwise.

11

branches' legislative authority. This is particularly true where, as is the case here, the political branches already made an initial policy determination. Accordingly, the relief and resolution of the Youths' claims would require the court to "bulldoze[ ] any notion of a separation of powers." Rousso v. State, 170 Wn.2d 70, 87, 239 P.3d 1084 (2010).

Ultimately, by wading into the waters of what policy approach to take, what economic and technological constraints exist, and how to balance all implicated interests to achieve the most beneficial outcome, the court would not merely "'serve[ ] as a check on the activities of another branch.'" Cf. McCleary v. State, 173 Wn.2d 477, 515, 269 P.3d 227 (2012) (finding it necessary to check the legislative branch's compliance with the explicit constitutional duty of the State to provide children an adequate education) (internal quotation marks omitted) (quoting In re Salary of Juvenile Dir., 87 Wn.2d 232, 241, 552 P.2d 163 (1976)). Rather, the judiciary would usurp the authority and responsibility of the other branches. Furthermore, it would be inappropriate for the judiciary to assume it can discern the appropriate GHG emissions reduction standard, "given the scale and complexity of the climate challenge," where "States must ensure an inclusive multi-stakeholder approach, which harnesses the ideas, energy and ingenuity of all stakeholders."[10] Therefore, we conclude that the Youths' claims present a political question to be determined by the people and their elected representatives, not the judiciary.

This conclusion is supported by Juliana II. There, 21 youths sought "an

---

[10] Joint Statement on "Human Rights and Climate Change," supra.

12

order requiring the government to develop a plan to 'phase out fossil fuel emissions and draw down excess atmospheric CO2." Juliana II, 947 F.3d at 1164-65. They asserted substantive due process rights, equal protection violations, rights under the Ninth Amendment, and a violation of the public trust doctrine. Id. The Ninth Circuit assumed that the "broad constitutional right" to "'a climate system capable of sustaining human life'" existed. Id. at 1164. Nevertheless, it concluded that the United States Constitution article III requirement for redressability was not satisfied: the plaintiffs' request for an order to promulgate a GHG emissions reduction plan "ignores that an Article III court will thereafter be required to determine whether the plan is sufficient to remediate the claimed constitutional violation of the plaintiffs' right." Id. at 1173. The court doubted "that any such plan can be supervised or enforced by an Article III court," and noted, "in the end, any plan is only as good as the court's power to enforce it." Id. at 1173.

Similarly, in 2011, a group of youths (collectively Svitak) sued Washington State, then Governor Christine Gregoire, and state agency directors alleging that the defendants violated the public trust doctrine. Svitak ex rel. Svitak v. State, No. 69710-2-I, slip op. at 1-2 (Wash. Ct. App. Dec. 16, 2013) (unpublished), http://www.courts.wa.gov/opinions/pdf/697102.pdf. Svitak argued that the State "failed to accelerate the pace and extent of [GHG] reduction." Id. at 2. Svitak sought declaratory judgment asking "th[e] court to create a new regulatory program." Id. at 5. On appeal, we held that the issue was a political question because Svitak did "not point to any constitutional provision violated by state

13

inaction regarding the atmosphere, [did] not challenge any state statute as unconstitutional, and, absent such unconstitutionality, cannot obtain a remedy under the [UDJA]." Id. at 2, 4-6. We concluded, "Because our state constitution does not address state responsibility for climate change, it is up to the legislature, not the judiciary, to decide whether[—and to what extent—]to act as a matter of public policy." Id. at 5. And as was the case then, "[t]his is particularly true here, where the legislature has already acted." Id. at 5-6.

Like in Juliana II and Svitak, we are without power "to order, design, supervise, or implement the plaintiffs' requested remedial plan" because such a plan "would necessarily require a host of complex policy decisions entrusted, for better or worse, to the wisdom and discretion of the executive and legislative branches." Juliana II, 947 F.3d at 1171. And we are "not equipped to legislate what constitutes a 'successful' regulatory scheme by balancing public policy concerns, nor can we determine which risks are acceptable and which are not. . . . [W]e lack the tools." Rousso, 170 Wn.2d at 88. For these reasons, we conclude that resolving the Youths' claims would violate the separation of powers doctrine; the issues that the Youths' claims present and the implementation and monitoring of the requested climate action plan require us to resolve political questions reserved for the executive and legislative branches.

The Youths disagree and rely on Seattle School District No. 1 v. State, 90 Wn.2d 476, 585 P.2d 71 (1978), and McCleary for the proposition that they are merely asking the court "to engage in its traditional and core duty to interpret and enforce Washington's Constitution." In Seattle School District, the District sued

14

the State, alleging that the State failed to discharge its constitutional duty under article IX, sections 1 and 2 of the state constitution to provide ample funding for education. 90 Wn.2d at 481-82. On appeal, our Supreme Court determined that article IX, section 1 imposes a mandatory affirmative duty on the State, which creates a "jural correlative" right in children to receive an adequate education. Id. at 500-01, 511-12. In concluding that the court's interpretation and construction of article IX, sections 1 and 2 do not violate the separation of powers doctrine, the court reasoned "that the judiciary has ample power to protect constitutional provisions that look to protection of personal 'guarantees.'" Id. at 502, 510. However, the court declined to specify standards for program requirements, concluding that "the general authority to select the *means* of discharging [the constitutional] duty should be left to the Legislature." Id. at 520.

Applying Seattle School District, in McCleary, our Supreme Court revisited the issue of whether the State was adequately discharging its affirmative, constitutionally prescribed duty to provide for children's education. McCleary, 173 Wn.2d at 512. In concluding that the State was not adequately discharging its duty, the court highlighted two aspects of article IX, section 1. First, because article IX, section 1 imposes a duty on the "*State*," the court concluded that it "contemplates a sharing of powers and responsibilities among all three branches of government." Id. at 515. Second, because article IX, section 1 creates a "true right" in children to receive education, the "federal limit on judicial review such as the political question doctrine or rationality review are inappropriate." Id. at 519. The court reasoned that in the context of a positive right, "we must ask whether

15

the state action achieves or is reasonably likely to achieve 'the constitutionally prescribed end.'" Id. (quoting Helen Hershkoff, Positive Rights and State Constitutions: The Limits of Federal Rationality Review, 112 Harv. L. Rev. 1131, 1137 (1999)). Our Supreme Court noted:

> While we recognize that the issue is complex and no option may prove wholly satisfactory, this is not a reason for the judiciary to throw up its hands and offer no remedy at all. Ultimately, it is our responsibility to hold the State accountable to meet its constitutional duty under article IX, section 1.

Id. at 546.

This case is distinguishable from Seattle School District and McCleary because, in both cases, the court found that the State has an affirmative, *constitutionally prescribed* duty to provide—and that children have a corresponding true right to receive—an adequate education. Accordingly, there was a judicially appropriate question concerning what satisfied that explicit duty. But "our state constitution does not address state responsibility for climate change," Svitak, No. 69710-2-I, slip op. at 5, and, in particular, provides no true right to a healthful and pleasant environment. Thus, neither case is persuasive.

The Youths disagree and cite Brown v. Plata, 563 U.S. 493, 131 S. Ct. 1910, 179 L. Ed. 2d 969 (2011), contending that "[a]s in Plata, the Superior Court can set the constitutional floor necessary for preservation of the Youth's rights." The Youths' reliance on Plata is misplaced. In Plata, the United States Supreme Court relied on the Prison Litigation Reform Act of 1995 in determining that a three-judge panel had authority to order California to reduce its prison population. Plata, 563 U.S. at 512. Here, we have no similar statute empowering the court's

16

review of the legislative and executive actions at issue. Accordingly, Plata does not control.

The Youths also contend that "it is entirely premature at this early stage to speculate as to the propriety of any relief that may ultimately be awarded." If the Youths' assertion were true, courts would consistently resolve political questions only to find out after considerable expenditure of court resources that the case must be dismissed or the court will violate the political question doctrine. Thus, we are not persuaded by the Youths' assertion.

Similarly, the Youths cite Martinez-Cuevas v. Deruyter Bros. Dairy, Inc., __ Wn.2d __, 475 P.3d 164 (2020), to support their assertion that their "constitutional claims should be decided on a full factual record as opposed to a motion to dismiss." Because Martinez-Cuevas does not discuss the standard of review on CR 12(c) motions or the propriety of developing a factual record thereunder, we disagree. Moreover, this is not the standard on a CR 12(c) motion to dismiss,[11] and factual development is not required to dismiss a political question. Accordingly, the Youths' assertion fails.

Finally, the Youths rely on a number of dissimilar cases for their position that the court may resolve their claims without violating the separation of powers doctrine. Because those cases concern distinct and distinguishable constitutional issues, we are not persuaded. See Milliken v. Bradley, 433 U.S. 267, 279-80, 97 S. Ct. 2749, 53 L. Ed. 2d 745 (1977) (addressing whether a court can order, as an equitable remedy, education programs in a desegregation

---

[11] Wash. Trucking, 188 Wn.2d at 207.

decree and holding that "the nature of the *desegregation* remedy is to be determined by the nature and scope of the constitutional violation" (emphasis added)); Rousso, 170 Wn.2d at 92 (addressing whether a statute violated the dormant commerce clause); In re Flint Water Cases, 960 F.3d 303, 324 (6th Cir. 2020) (addressing the substantive due process right to bodily integrity); Martinez-Cuevas, 475 P.3d at 167 (addressing a statute's provision "exempting agricultural workers from the overtime pay requirement set out in the Washington Minimum Wage Act, ch. 49.46 RCW" and concluding it violates article I, section 12 of our state constitution).

The Uniform Declaratory Judgments Act

The Youths contend that their claims are justiciable under the UDJA. Because the court's resolution of this case would not be final or conclusive, we disagree.

The UDJA provides a means by which a party may bring a claim for declaratory relief. It states that "[a] person . . . whose rights, status or other legal relations are affected by a statute . . . may have determined any question of construction or validity arising under the . . . statute . . . and obtain a declaration of rights, status or other legal relations thereunder." RCW 7.24.020. But "'before the jurisdiction of a court may be invoked under the act, there must be a justiciable controversy.'" To-Ro Trade Shows v. Collins, 144 Wn.2d 403, 411, 27 P.3d 1149 (2001) (quoting Diversified Indus. Dev. Corp. v. Ripley, 82 Wn.2d 811, 814-15, 514 P.2d 137 (1973)). A justiciable controversy is one which presents

> "(1) . . . an actual, present and existing dispute, or the mature seeds of one, as distinguished from a possible, dormant,

> hypothetical, speculative, or moot disagreement, (2) between parties having genuine and opposing interests, (3) which involves interests that must be direct and substantial, rather than potential, theoretical, abstract or academic, and (4) a judicial determination of which will be final and conclusive."

To-Ro Trade Shows, 144 Wn.2d at 411 (alteration in original) (quoting Diversified Indus. Dev. Corp., 82 Wn.2d at 815).

Here, at the very least, the fourth element is lacking. Specifically, the Youths requested that the trial court retain jurisdiction over the matter to monitor and enforce the State's implementation of a climate recovery plan. This would include ensuring that the defendant agencies enact rules in accordance with legislation the court deems satisfactory. Such a remedy is necessarily provisional and ongoing, not final or conclusive. While the declaratory relief would be final, it is inextricably tied to the retention of jurisdiction and to the order to implement the climate recovery plan. And a trial court order would not result in the atmospheric carbon levels required to either stabilize the future global climate or to protect the Youths' asserted right because the world must act collectively in order to stabilize the climate.[12] See Juliana II, 947 F.3d at 1173. Therefore, the Youths' claims are not justiciable under the UDJA.

The Youths assert that "[n]o new laws are necessary to remedy past and ongoing constitutional violations," and that, therefore, their claims are justiciable under the UDJA. However, in their complaint, and throughout this appeal, the

---

[12] We recognize that this is not a reason to resist the opportunity to implement advanced climate change policies. It does, however, provide evidence that judicial resolution would not be final or conclusive and, therefore, inappropriate.

Youths requested that the court order the State to create a climate plan, i.e., new legislation regarding the reduction of GHG emissions, and that we determine the appropriate GHG emission reductions. Therefore, the Youths' assertion is implausible and unpersuasive.

In short, the separation of powers doctrine and the lack of justiciability under the UDJA are dispositive with regard to all of the Youths' claims. Therefore, the trial court did not err by dismissing them. We next address the merits of the Youths' various claims to foreclose any assertion that their resolution should alter our conclusion.

### Substantive Due Process

The Youths assert that the trial court erred when it concluded that there is no fundamental right "to a healthful and pleasant environment," which includes "the right to a stable climate system that sustains human life and liberty." Because the Youths fail to provide a basis for the court to find the unenumerated right to a healthful environment and because we must exercise the utmost care in extending the liberties protected by the due process clause, we disagree.

"An individual seeking the procedural protection of the Fourteenth Amendment's due process clause must establish that [their] interest in life, liberty, or property is at stake." In re Pers. Restraint of McCarthy, 161 Wn.2d 234, 240, 164 P.3d 1283 (2007). But "[t]he Due Process Clause guarantees more than fair process, and the 'liberty' it protects includes more than the absence of physical restraint." Washington v. Glucksberg, 521 U.S. 702, 719, 117 S. Ct. 2258, 2267, 138 L. Ed. 2d 772 (1997) (quoting Collins v. Harker

Heights, 503 U.S. 115, 125, 112 S. Ct. 1061, 117 L.Ed.2d 261 (1992)). "Modern substantive due process jurisprudence requires a 'careful description of the asserted fundamental liberty interest.'" Braam v. State, 150 Wn.2d 689, 699, 81 P.3d 851 (2003) (internal quotation marks omitted) (quoting Glucksberg, 521 U.S. at 721). But "[t]he identification and protection of fundamental rights . . . 'has not been reduced to any formula.'" Obergefell v. Hodges, 576 U.S. 644, 663-64, 135 S. Ct. 2584, 192 L. Ed. 2d 609 (2015) (quoting Poe v. Ullman, 367 U.S. 497, 542, 81 S. Ct. 1752, 6 L. Ed. 2d 989 (1961) (Harlan, J., dissenting)). "[I]t requires courts to exercise reasoned judgment in identifying interests of the person so fundamental that the State must accord them its respect," and "[h]istory and tradition guide and discipline this inquiry but do not set its outer boundaries." Id. at 664.

As an initial matter, it is important to articulate the Youths' claimed right and legal bases. The Youths assert a fundamental right to "a healthful and peaceful environment, which includes a stable climate system." In support of this alleged right, the Youths cite Washington Constitution article I, section 3 and section 30, and RCW 43.21A.010.[13] These provisions do not provide for the

---

[13] The Youths also cite the United Nations *Joint Statement on "Human Rights and Climate Change"* as evidence of their substantive due process right to a peaceful environment. However, they failed to provide authority to support the proposition that a UN joint statement may be used as a basis for substantive due process rights. We therefore do not address it as such a basis. See City of Seattle v. Levesque, 12 Wn. App. 2d 687, 697, 460 P.3d 205 ("'Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none.'" (quoting DeHeer v. Seattle Post-Intelligencer, 60 Wn.2d 122, 126, 372 P.2d 193 (1962))), review denied, 195 Wn.2d 1031 (2020).

asserted right. In particular, unlike the constitutional mandate creating an affirmative duty in Seattle School District and McCleary, none of these provisions provide a true right, created by a positive constitutional grant, which the State cannot invade or impair.

Article I, section 3 of the state constitution states that "[n]o person shall be deprived of life, liberty, or property, without due process of law," mimicking the Fourteenth Amendment. "The types of interests that constitute 'liberty' and 'property' for Fourteenth Amendment purposes are both broad and limited[:] The interest must rise to more than 'an abstract need or desire'" "and must be based on more than 'a unilateral hope.'" In re Pers. Restraint of Lain, 179 Wn.2d 1, 14, 315 P.3d 455 (2013) (quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972); Conn. Bd. of Pardons v. Dumschat 452 U.S. 458, 465, 101 S. Ct. 2460, 69 L. Ed. 2d 158 (1981)). The court should expand substantive due process protections in very limited circumstances "'because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended.'" Glucksberg, 521 U.S. at 720 (quoting Collins v. City of Harker Heights, 503 U.S. 115, 125, 112 S. Ct. 1061, 117 L. Ed. 2d 261 (1992)). And in "extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action." Id. Therefore, the court must "'exercise the utmost care whenever we are asked to break new ground in this field,' . . . lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the [judiciary]." Id. (quoting Collins,

503 U.S. at 125).

An examination of "our Nation's history, legal traditions, and practices"[14] presents no evidence of a liberty interest in a healthful and peaceful environment. In particular, only one court has ever held that there exists a fundamental right to a climate system capable of sustaining life. See Juliana v. United States (Juliana I), 217 F. Supp. 3d 1224, 1250 (D. Or. 2016) (holding that there is a fundamental right to a climate system capable of sustaining life), rev'd and remanded, 947 F.3d 1159 (9th Cir. 2020); cf. Clean Air Council v. United States, 362 F. Supp. 3d 237, 250 (E.D. Pa. 2019) (holding that there is no "fundamental right to a life-sustaining climate system"); SF Chapter of A. Philip Randolph Inst. v. U.S. EPA, No. C07-04936 CRB, 2008 WL 859985, at *7 (N.D. Cal. Mar. 28, 2008) (court order) (holding that the right to be free from climate change pollution is not a fundamental right under the Fourteenth Amendment); Nat'l Sea Clammers Ass'n v. City of New York, 616 F.2d 1222, 1238 (3d Cir. 1980) (holding that "there is no constitutional right to a pollution-free environment"), vacated on other grounds sub nom. Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n, 453 U.S. 1, 101 S. Ct. 2615, 69 L. Ed. 2d 435 (1981); Concerned Citizens of Neb. (CCN) v. U.S. Nuclear Regulatory Comm'n (NRC), 970 F.2d 421, 427 (8th Cir. 1992) (holding that under the Ninth Amendment and the equal protection clause, CCN does "not have a fundamental right to be free from non-natural radiation").[15]  While the lack of a historical and legal tradition

---

[14] See Glucksberg, 521 U.S. at 710.
[15] The Swinomish Indian Tribal Community, Suquamish Tribe, and Quinault Indian Nation assert that the right to a healthful environment is

protecting the environment for future generations almost certainly led us to the position we are in now, there simply is no historical basis for the determination that a right to a healthful or stable environment exists.  Moreover, were we to create such an interest, we would transform substantive due process rights into the policy preferences of the court.  Therefore, we conclude that article I, section 3 does not provide a fundamental right to a healthful and peaceful environment.

Article I, section 30 provides that "[t]he enumeration in this Constitution of certain rights shall not be construed to deny others retained by the people."  More specifically, article I, section 30 is a declaration that the statement of "certain fundamental rights belonging to all individuals and made in the bill of rights shall not be construed to mean the abandonment of others" that the

---

fundamental because it is the "prerequisite to the free exercise of specific, enumerated rights," specifically, life and liberty.  To this end, they liken the Youths' alleged right and the rights to life and liberty to the right to municipality employment and the right to travel.  They cite Eggert v. City of Seattle, 81 Wn.2d 840, 841-44, 505 P.2d 801 (1973), for the proposition that a court looks to "whether [the asserted] right is implicit and necessary to the exercise of enumerated rights, and whether the right is deeply embedded in societal values."  In Eggert, the court held that the city of Seattle's one year residency requirement for employment violated the constitutionally protected right to travel.  Id. at 848.  The court chose not to address whether the right to employment was fundamental.  Id.  While the right to life and liberty may be connected to the right to a healthful and pleasant environment, as discussed, we must be weary of extending due process liberty interests into new arenas.  More importantly, the right to employment or to one's chosen occupation has historically been viewed as a protected interest.  See Fields v. Dep't of Early Learning, 193 Wn.2d 36, 46, 434 P.3d 999 (2019) (noting that the plaintiff had a "protected interest, but not a fundamental right, to pursue her chosen, lawful occupation").  However, the right to a healthful environment—for better or worse—has not been embedded in our societal values such that it is considered a protected interest.  Accordingly, we are not persuaded.

24

constitution does not express but that "inherently exist in all civilized and free states." State v. Clark, 30 Wash. 439, 443-44, 71 P. 20 (1902).

As noted above, the Youths point to no legal or social history to support their asserted right, and the State is not required to "disprove the existence of [the asserted] right" under article I, section 30. Halquist v. Dep't of Corr., 113 Wn.2d 818, 820, 783 P.2d 1065 (1989). Without a showing of how the asserted right inherently exists and has existed in civilized states, the Youths' contention fails. Accordingly, we conclude that article I, section 30 does not provide the right to a healthful and peaceful environment or to a stable climate system.

RCW 43.21A.010 provides:

The legislature recognizes and declares it to be the *policy* of this state, that it is a fundamental and inalienable right of the people of the state of Washington to live in a healthful and pleasant environment and to benefit from the proper development and use of its natural resources. The legislature further recognizes that as the population of our state grows, the need to provide for our increasing industrial, agricultural, residential, social, recreational, economic and other needs will place an increasing responsibility on all segments of our society to plan, coordinate, restore and regulate the utilization of our natural resources in a manner that will protect and conserve our clean air, our pure and abundant waters, and the natural beauty of the state.

(Emphasis added). RCW 43.21A.010 is merely a policy declaration "explain[ing] goals, or designat[ing] objectives to be accomplished." Cf. Seattle School Dist., 90 Wn.2d at 499 (holding that because article IX, section 1 explicitly provides a constitutionally mandated duty and a correlative right for children to receive an adequate education, it is not merely a policy declaration). While the statute articulates the policy of the legislature, it does not provide an interest and cannot provide for a fundamental right. Therefore, RCW 43.21.010 does not provide a

25

basis for the asserted right.

The Youths disagree and contend that the trial court failed to "undertake the proper analysis for identifying unenumerated fundamental rights." Specifically, they assert that the trial court failed to recognize that an unenumerated fundamental right may be created by statute. While this is true, the relied on statutory provision cannot be a policy statement. See, e.g., State v. Hand, 192 Wn.2d 289, 302, 429 P.3d 502 (2018) (Madsen, J., concurring) (holding that where the statute established "only aspirational timelines" and procedures, the asserted fundamental right did not exist). As discussed, RCW 63.21A.010 is a policy statement. Therefore, we are not persuaded.

As a final matter, to the extent that the amici curiae focus on the right to a stable climate system, that focus is not entirely aligned with the Youths' claim. Specifically, the Youths' claim is much broader, and in their opposition to the State's motion to dismiss, the Youths discuss only the right to a healthful and peaceful environment. Nonetheless, even if the Youths asserted the narrow right to a stable climate system, their reliance on Juliana I, 217 F. Supp. 3d at 1250, which concluded that a fundamental right to "a stable climate system" exists, is unpersuasive for three reasons. First, Juliana I was reversed based on the nonjusticiability of the question presented and therefore is not a final order with persuasive authority. See Juliana II, 947 F.3d at 1175. While the Ninth Circuit did not address whether there exists a constitutional right, we are not persuaded by Juliana I's conclusion. Second, Juliana I is an outlier in finding that the right

26

exists.[16]  Finally, Juliana I's and the Youths' reliance on Obergefell is misplaced because Obergefell dealt with a right it described as a "keystone of our social order" and a liberty interest deeply rooted in our Nation's and the judiciary's history and traditions.  Obergefell, 576 U.S. at 669.  Because the Youths fail to proffer similar history with regard to a healthful environment *or* a stable climate system, neither Obergefell nor Juliana I is persuasive.  See, e.g., Lake v. City of Southgate, No. 16-10251, 2017 WL 767879, at *4 (E.D. Mich. Feb. 28, 2017) (court order) (concluding that the plaintiff did not have a fundamental right "in health or freedom from bodily harm" because she failed to provide a "'careful description'" as required under Glucksberg and provided no "evidence that [the] alleged right is rooted in our nation's traditions or implicit in the concept of ordered liberty" (quoting Glucksberg, 521 U.S. at 720-21)).

Equal Protection Claim

The Youths contend that the State violated their right to equal protection of the law under article I, section 12.[17]  Because the Youths failed to establish that a fundamental right has been implicated or that they received disparate treatment because of their membership in a suspect or quasi-suspect class with immutable characteristics, we disagree.

"The Equal Protection clause of the Washington State Constitution, article I, section 12 . . . require[s] that 'persons similarly situated . . .' receive like

---

[16] See supra note 9.

[17] They further assert that the trial court erred because it did not address their equal protection claim pertaining to discrimination with regard to a fundamental right.  But because we conclude that no fundamental right to a peaceful and stable environment exists, we do not address this contention.

treatment."[18] Kustura v. Dep't of Labor & Indus., 142 Wn. App. 655, 684, 175 P.3d 1117 (2008) (quoting State v. Coria, 120 Wn.2d 156, 169, 839 P.2d 890 (1992)), aff'd on other grounds, 169 Wn.2d 81, 233 P.3d 853 (2010). To assert an equal protection claim, the Youths must first establish that a fundamental right has been implicated or that the Youths "received disparate treatment because of membership in a class of similarly situated individuals, and that the disparate treatment was the result of intentional or purposeful discrimination." Thornock v. Lambo, 14 Wn. App. 2d 25, 33, 468 P.3d 1074 (2020). Stated differently, the State must have implicated "a fundamental right" in taking discriminatory action or drawn a "suspect or semisuspect classification." Kustura, 142 Wn. App. at 684.

The Youths contend that "[t]he affirmative aggregate acts of Defendants reflect a *de facto* policy choice to favor the present generation's interests to the long-term detriment of" the Youths. The Youths' contention is unpersuasive. First, "[a] suspect class 'must have suffered a history of discrimination, have as the characteristic defining the class an obvious, immutable trait that frequently bears no relation to ability to perform or contribute to society, and show that it is a minority or politically powerless class.'" Kustura, 142 Wn. App. at 685 (quoting Andersen v. King County, 158 Wn.2d 1, 19, 138 P.3d 963 (2006) (plurality opinion), abrogated by Obergefell, 576 U.S. 644 (2015)). Here, youth is not an

---

[18] "The equal protection clause of the Fourteenth Amendment and article I, section 12 of the Washington State Constitution are 'substantially identical and subject to the same analysis.'" Thornock v. Lambo, 14 Wn. App. 2d 25, 33, 468 P.3d 1074 (2020) (quoting State v. Osman, 157 Wn.2d 474, 483 n.11, 139 P.3d 334 (2006)).

immutable characteristic. "[I]mmutable" is defined as "not capable or susceptible of change." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1131 (2002). As the superior court correctly noted, "each [Youth], like every human, will grow older." And while children are "socially, emotionally, physically, and psychologically vulnerable and different from adults in manners beyond their control," this status does not last forever and inevitably changes. Accordingly, the Youths are not a suspect class.

Second, the Youths contend that they will be disparately affected in the future, not that they are suffering a discriminatory deprivation of their right to a healthful or stable environment today. But case law does not support the proposition that an equal protection claim can be premised on a future deprivation, and the Youths provide no persuasive authority to convince us to conclude otherwise.

Lastly, the aggregate acts of the State do not show any discrimination or discriminatory intent. Accordingly, the Youths fail to establish that the State has treated them disparately. For these reasons, we conclude that, as a matter of law, the Youths failed to present a valid equal protection claim.

The Youths disagree and assert that they are a suspect class. The Youths assert that they are suspect or semisuspect because they will be the most affected by climate change, they are unable to vote, and they "do not have economic power to influence the state's energy and transportation system." To this end, they cite Miller v. Alabama, which states, "'[Y]outh is more than a chronological fact.' It is a time of immaturity, irresponsibility, 'impetuousness[,]

and recklessness.' It is a moment and 'condition of life when a person may be most susceptible to influence and to psychological damage.'" 567 U.S. 460, 476, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012) (second alteration in original) (citations omitted) (quoting Eddings v. Oklahoma, 455 U.S. 104, 115, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982); Johnson v. Texas, 509 U.S. 350, 368, 113 S. Ct. 2658, 125 L. Ed. 2d 290 (1993)). The Miller court did not address age in the context of equal protection or youths' statuses as a suspect class. Id. at 479 (concluding that mandatory life sentences without the possibility of parole for juvenile offenders are unconstitutional pursuant to the Eighth Amendment). Accordingly, Miller is not persuasive.

The Youths also rely on Plyler v. Doe, 457 U.S. 202, 102 S. Ct. 2832, 72 L. Ed. 2d 786 (1982), to support their contention that they are a suspect class. In Plyler, the United States Supreme Court applied heightened scrutiny to Texas laws that withheld funding for public education where the school allowed undocumented children to attend. Id. at 220. In applying heightened scrutiny, the Court reasoned that while undocumented status is not "an absolutely immutable characteristic," laws discriminating against undocumented children place a "discriminatory burden on the basis of a legal characteristic over which children can have little control." Id. But here, the characteristic at issue is age only, not undocumented status as a child. Furthermore, the children in Plyler provided evidence that Texas was discriminating based on this status characteristic. Therefore, Plyler does not control.

State-Created Danger Claim

The Youths claim that the trial court erred in dismissing their state-created danger claim. Because the Youths fail to show that the State's actions put them in a worse position, we disagree.

To succeed on a state-created danger claim, the Youths "must show not only that the [State] acted 'affirmatively,' but also that the affirmative conduct placed [them] in a 'worse position than that in which [they] would have been had [the state] not acted at all.'" Pauluk v. Savage, 836 F.3d 1117, 1124 (9th Cir. 2016) (some alterations in original) (quoting Johnson v. City of Seattle, 474 F.3d 634, 641 (9th Cir. 2007)).

Here, the Youths cannot show that the State acted affirmatively to create the danger. Rather, despite their contentions to the contrary, the Youths alleged injuries stemming from the State's failure to act more aggressively with regard to regulating GHG emissions.[19] Nonetheless, any affirmative actions by the State did not put the Youths in a worse position than that in which they would have been without the State's action: the State's regulation of GHG emissions, although it fails to provide for the reductions that the Youths claim are necessary

---

[19] In their complaint, the Youths contended that the State pursued and implemented policies "that result in dangerous levels of GHG emissions." They went on to explain, however, that the State "placed [them] in a position of danger with deliberate indifference to [the Youths] safety" by its "ongoing act of *omission* in not reducing Washington's GHG emissions consistent with rates that would avoid dangerous climate interference." (Emphasis added.) The Youths further asserted that the State failed to implement its "own laws, plans, policies, and recommendations for climate stabilization or any other comprehensive remedial measures." In short, the Youths' claims, despite their characterization below and on appeal, revolve around omissions or actions, which the Youths perceive are not adequate to remedy climate change.

to protect the environment, still places the Youths in a position of lesser danger than that which they would be in if the State chose not to regulate GHG emissions at all. Accordingly, the state-created danger exception does not apply, and the Youths' claim fails.

The Youths disagree and inappropriately rely on Pauluk and Munger v. City of Glasgow Police Dep't, 227 F.3d 1082 (9th Cir. 2000), for the proposition that the State has a duty to protect the Youths from climate change. In Pauluk, the court held that Daniel Pauluk's family established a valid state-created danger claim where Pauluk died from exposure to toxic mold in a county health office after county officials transferred Pauluk, over his objections, to a building known to contain toxic mold. 836 F.3d at 1119, 1125. In Munger, the Ninth Circuit held that summary judgment was improper for a state-created danger claim where Lance Munger died after police officers ejected him from a Montana bar at night when the outside temperatures were subfreezing. 227 F.3d at 1087, 1090. In both cases, state actors affirmatively placed the individuals in known danger, which resulted in the individuals' deaths. Here, the State has not affirmatively placed the Youths in a worse position or injured them.

In addition, the Youths' reliance on Braam is misplaced because, there, the State acted affirmatively as "the custodian and caretaker" of children in the foster care system. Braam, 150 Wn.2d at 703-04. Despite the Youths' contentions, the State's role as a custodian and caretaker of foster children is not analogous to "the State's role in energy and transportation system[s]." Therefore, these cases are not persuasive.

Public Trust Doctrine

The Youths contend that they alleged valid public trust doctrine claims. Because the Youths' complaint alleges a violation of the public trust doctrine in relation to the climate system as a whole, including the atmosphere, and because Washington has not yet expanded the public trust doctrine to encompass the atmosphere, we disagree.

The public trust doctrine is based on the common law, but article XVII of our constitution "partially encapsulate[s]" the public trust doctrine. Rettkowski v. Dep't of Ecology, 122 Wn.2d 219, 232, 858 P.2d 232 (1993). Specifically, article XVII, section 1 asserts state ownership of "the beds and shores of all navigable waters in the state up to and including the line of ordinary high tide, in waters where the tide ebbs and flows, and up to and including the line of ordinary high water within the banks of all navigable rivers and lakes."

The public trust doctrine has never been applied to the atmosphere. To this end, Rettkowski is instructive. There, a group of cattle ranchers brought a claim against Ecology based on Ecology's failure to prevent the depletion of a creek that the ranchers used to water their cattle. Rettkowski, 122 Wn.2d at 221-22. The ranchers contended and, after performing studies, Ecology discovered that groundwater withdrawals from irrigation farmers negatively affected the creek's flow. Id. at 221. In dicta, the court discussed the application of the public trust doctrine to groundwater, noting that one problem with applying the doctrine to the ranchers' claim was that Washington has "never previously interpreted the doctrine to extend to non-navigable waters or groundwater." Id. at 232. It

therefore declined to extend the doctrine thereto. Id. Similarly, Washington courts have never extended the public trust doctrine to the atmosphere, and we decline to do so now.

The Youths contend that, in Rettkowski, our Supreme Court "intentionally avoided delineating the scope of the" public trust doctrine. The court stated, "We similarly do not need to address the scope of the doctrine today." Id. at 232 n.5. The Youths contend that this avoidance amounts to an implicit statement that the public trust doctrine applies to the atmosphere. But it is a legal fallacy to rely on the court declining to address an issue to prove the existence of the principle not addressed, i.e., what resources fall under the public trust doctrine. Therefore, the Youths' reliance on Rettkowski is misplaced.

More generally, the Youths contend that "'the navigable waters and the atmosphere are intertwined and to argue a separation of the two, or to argue that GHG emissions do not affect navigable waters is nonsensical.'" To this end, the Youths cite the Code of Justinian from 6th Century Rome as the basis for the public trust doctrine's application to the air. However, "the interconnectedness of natural resources . . . does not mean that all natural resources, including the atmosphere, must be considered public trust resources under . . . [the] public trust doctrine." Chernaik v. Brown, 367 Or. 143, 165, 475 P.3d 68 (2020). And we decline "to expand the resources included in the public trust doctrine well beyond its current scope" to include the atmosphere. Id. at 166.

The Youths and amici rely heavily on the superior court's order in Foster v. Department of Ecology, affirming the Department of Ecology's Denial of Petition

34

for Rulemaking. No. 14-2-25295-1 SEA (King County Super. Ct., Wash. Nov. 19, 2015). There, the court declared that the public trust doctrine applies to the atmosphere. Id. But we are not bound by a trial court's decision,[20] and our analysis does not lead us to the conclusion that the public trust doctrine applies to the atmosphere. Accordingly, we are not persuaded.

Finally, the Youth assert that they "alleged impairment to traditional Public Trust Resources such as navigable waters and submerged lands." But in their complaint, the Youths asserted that "[t]he overarching public trust resource is the climate system, which encompasses the atmosphere, waters, oceans, and biosphere." They explained, "The dangerous levels of [GHG] emissions that Defendants have allowed into the *atmosphere* have a scientifically demonstrable effect on the public's ability to use, access, enjoy and navigate the state's tidelands, shorelands, and navigable waters and other Public Trust Resources." Therefore, we are not persuaded by the Youths' attempt to recharacterize their allegation.[21]

---

[20] See In re Estate of Jones, 170 Wn. App. 594, 605, 287 P.3d 610 (2012) ("Stare decisis is not applicable to a trial court decision because 'the findings of fact and conclusions of law of a superior court are not legal authority and have no precedential value.'" (quoting Bauman v. Turpen, 139 Wn. App. 78, 87, 160 P.3d 1050 (2007))).

[21] The Sauk-Suiattle Indian Tribe contends that the Quinault youth, as members of the Quinault Indian Nation, have constitutionally protected treaty rights under the Quinault Treaty.[21] But the Youths did not raise this argument. Therefore, we do not address it. City of Seattle v. Evans, 184 Wn.2d 856, 861 n.5, 366 P.3d 906 (2015) (A court "'will not address arguments raised only by amicus.'") (quoting Citizens for Responsible Wildlife Mgmt. v. State, 149 Wn.2d 622, 631, 71 P.3d 644 (2003)).

CONCLUSION

The Youths deserve a stable environment and a legislative and executive branch that work hard to preserve it. However, this court is not the vehicle by which the Youths may establish and enforce their policy goals. Because resolution of the Youths' claims would require this court to violate the separation of powers doctrine, we affirm.

_____

WE CONCUR:

_____     _____
Brennan, J                  Mann, C.J.