**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| THE ESTATE OF DANIEL ALEXANDER MCCARTNEY; by and through Personal Representative CIERRA RENAE MCCARTNEY; CIERRA RENAE MCCARTNEY, individually and as the marital community of Cierra Renae and Daniel Alexander McCartney; TYTUS JOHN ALEXANDER MCCARTNEY, minor child of Daniel and Cierra McCartney; TATE DANIEL MCCARTNEY, minor child of Daniel and Cierra McCartney; and TRAXTON LANE MCCARTNEY, minor child of Daniel and Cierra McCartney, | No. 55663-4-II |
| Appellants, | |
| v. | PUBLISHED OPINION |
| PIERCE COUNTY, a municipal corporation, located in Washington State, | |
| Respondent. | |

WORSWICK, J. — The Estate of Daniel McCartney, by and through its personal representative, Cierra McCartney, and other members of the McCartney family (hereinafter, McCartneys), appeal the trial court's dismissal of their complaint for wrongful death and for a writ of mandamus. Daniel McCartney, a Pierce County sheriff's deputy, was killed in the line of duty. The McCartneys filed a wrongful death lawsuit against Pierce County (County), seeking damages for alleged failures of the County to properly staff and train the Pierce County Sheriff's

No. 55663-4-II

Department (Sheriff's Department). The McCartneys further sought a writ of mandamus ordering the County to provide the Sheriff's Department with "sufficient staffing." The County moved for judgment on the pleadings, seeking dismissal under CR 12(c), arguing discretionary governmental immunity, the professional rescuer doctrine, and that a writ of mandamus was not proper. The trial court granted the motion.[1]

We hold that (1) the trial court properly took judicial notice of public records, (2) discretionary immunity bars the McCartneys' suit, (3) the professional rescuer doctrine also bars the McCartneys from recovering, (4) a writ of mandamus is inappropriate because the County's decisions on staffing are discretionary, and (5) the public records did not create a genuine issue of material fact. Thus, we hold that the trial court did not err when it entered judgment on the pleadings. We affirm.

FACTS

I. BACKGROUND: PIERCE COUNTY'S SHERIFF DEPUTY HIRING AND ALLOCATION

Pierce County covers 1,806 square miles of land.[2] For patrol purposes, the county is divided into districts, to which sheriff deputies are assigned. The Sheriff's Department also contracts with several cities and towns in the county to provide police forces. The districts vary in both geographic size and the number of deputies assigned. For example, in 2018, the

---

[1] The National Police Association filed an amicus curiae brief in support of the McCartneys.

[2] Because this is an appeal from a CR12(c) motion for judgment on the pleadings, we take the facts from the pleadings. *Aji P. v. State*, 16 Wn. App. 2d 177, 187, 480 P.3d 438, *review denied*, 198 Wn.2d 1025, 497 P.3d 350 (2021).

No. 55663-4-II

department had allocated 13 officers to University Place duty, covering 8.42 square miles, while district 10 was allocated 15 officers to cover 700 square miles.[3]

Between 2001 and 2018, the Pierce County Council (Council) hired outside consultants to conduct three separate audits of the Sheriff's Department. Each determined that the department was understaffed in terms of deputies. Between 2009 and 2018, the department had added a net of 11 deputies. However, a 2018 staffing assessment determined the department had 40 fewer deputies than the audits recommended to patrol the county. The consultants opined that the department was a "'lean' organization," and that its' staffing "present[ed] challenges to organizational effectiveness and create[d] a higher level of risk and liability. While the deputy sheriffs are dedicated to delivering high-quality police services, there are simply not enough of them assigned to the patrol function." Clerk's Papers (CP) at 26.

Between 2004 and 2009, the County increased the Sheriff's Department's budget by $2 million each year. However, this was less than enough funding to increase the department's staff to the levels recommended by the Council's consultants. Further complicating the staffing challenge was the department's inability to find qualified candidates to fill all the budgeted positions and months-long hiring, vetting, and training programs.

Because of the lean staffing and large areas some of the patrols experienced, deputies knew that backup could be "many miles and many minutes" away. CP at 4. Accordingly, the department instructed deputies to wait for backup on dangerous calls.

The Sheriff's Department hired Deputy McCartney in 2014. McCartney was a veteran lateral hire from the Hoquiam Police Department, with which he had served since 2009, and he

---

[3] The record is silent as to the population of each district.

3

No. 55663-4-II

had at least four months of law enforcement academy training. The department assigned McCartney to district 10, in which deputies were assigned to patrol alone.

## II. DEPUTY MCCARTNEY'S MURDER

On January 6, 2018, McCartney worked back-to-back shifts from 3:00 PM overnight until 6:00 AM the next morning. On January 7, he volunteered to take a shift for another deputy who was ill. After less than six hours of sleep, McCartney returned to work that evening to cover the absent deputy's overnight shift.

At around 11:00 PM on January 7, six sheriff deputies responded to a house fire with an active shooter in Tacoma, to back up the Tacoma police. While deputies were on scene in Tacoma, a 911 call came in at 11:23 PM from the Frederickson area of unincorporated Pierce County and reported a home invasion was in progress. The 911 operator could hear screaming, glass breaking, and loud banging during the call. The Frederickson area is within sheriff district 7, which is adjacent to district 10.

Although outside of his assigned patrol area, dispatch sent McCartney to respond to the Frederickson call. He arrived at the scene at 11:29 PM, requested backup, was given a description of the suspects, and informed that children may be inside the home. At 11:33 PM, McCartney reported to dispatch that he saw the suspects running on foot. Within a minute, McCartney began to give chase on foot, reported shots were fired, and then his radio fell silent.

A sheriff sergeant ordered that McCartney's radio microphone be opened so that two-way communications could take place without interruption, but the open-microphone program did not function because of the amount of other simultaneous radio traffic on the same channel. At 11:37 PM, other responding deputies arrived and discovered McCartney with a gunshot wound.

4

No. 55663-4-II

He was not transported to a hospital until after midnight, and medical professionals pronounced him dead in the early hours of January 8.

In the aftermath of the shooting, police arrested Frank Pawul, Samantha Jones, and Brenda Troyer, and discovered the body of their accomplice, Henry Carden, at the scene of the shooting. Pawul, Carden, Jones, and Troyer had broken into a home at which Jones had previously conducted a drug deal to demand money from its residents. They had held three adults and two children at gunpoint while they searched the home. Pawul pleaded guilty to aggravated first degree murder with a firearm for the death of McCartney. Jones also pleaded guilty to first degree murder, and Troyer pleaded guilty to first degree rendering criminal assistance for having provided Pawul with information as to the location of law enforcement in order that he could avoid apprehension.

### III. PROCEDURAL HISTORY

The McCartneys filed a complaint for damages against the County in February 2021. The first cause of action was for wrongful death–negligence. The McCartneys alleged that the County had a duty to provide McCartney with a safe workplace, proper supervision, adequate training, and sufficient support. They alleged that the County was negligent for not hiring sufficient deputies such that McCartney would not have had to face "unreasonably unsafe working conditions." CP at 13. They further alleged that the County negligently created unsafe working conditions through understaffing, that the Council failed to properly staff the Sheriff's Department, that the department was negligently slow in hiring additional deputies, and that the County had no written policy on when a supervisor or multiple deputies needed to be called in

5

No. 55663-4-II

for backup. Thus, the McCartneys alleged that "[b]ut for Pierce County's failure to properly staff and train its deputies, Daniel McCartney would likely still be alive." CP at 17.

In their second cause of action, the McCartneys requested the court issue a writ of mandamus to the County, "mandating sufficient staffing or other equitable relief that will prevent a repeat of another wrongful deputy death." CP at 18. The McCartneys did not provide further detail on what such mandatory staffing or equitable relief would entail. Instead, the McCartneys asked the court to compel Pierce County to either provide "sufficient" staffing or "stop responding to calls when sufficient staffing is not possible." CP at 19.

The County filed an answer to the complaint on March 12. In it, the County raised multiple defenses, including discretionary immunity for the exercise of governmental authority of elected public officials. The County also filed a third party complaint against Pawul, Jones, and Troyer as the proximate cause of McCartney's death.

That same day, the County filed a motion to dismiss under CR 12(c). In its motion, the County included information from the public record, including Council resolutions, committee meeting minutes, and committee meeting recordings in which the Council was presented with emergency statistics, response times, recruiting efforts, and hiring and training information. Although referenced in the text, the records themselves were hyperlinked in a footnote. The County argued that discretionary governmental immunity and the professional rescuer doctrine barred the McCartneys' suit. The County also argued that a writ of mandamus was not proper because the issues that the McCartneys raised were within the legislative discretion of the Council.

6

No. 55663-4-II

The McCartneys responded to the County's motion, first arguing that the professional rescuer doctrine does not bar suit because McCartney was not rescuing anyone. Next, the McCartneys argued that the County had no discretionary immunity because it had not made a "considered decision" on deputy staffing and that the Council's actions, or lack thereof, created a genuine issue of material fact requiring trial. CP at 138. The McCartneys also argued that a writ of mandamus was appropriate to compel the County to staff deputy positions.

At the hearing on the motion, the County asked the court to take judicial notice of the County records provided in its motion to dismiss to support its argument that staffing decisions were high level policy decisions. The McCartneys objected to the court's taking judicial notice of the public records, arguing that the records could be considered only if admitted as evidence under RCW 5.44.040[4] and .080.[5]

---

[4] RCW 5.44.040 provides:

> Copies of all records and documents on record or on file in the offices of the various departments of the United States and of this state or any other state or territory of the United States or any federally recognized Indian tribe, when duly certified by the respective officers having by law the custody thereof, under their respective seals where such officers have official seals, must be admitted in evidence in the courts of this state.

[5] RCW 5.44.080 provides:

> All ordinances passed by the legislative body of any city or town shall be recorded in a book to be kept for that purpose by the city or town clerk, and when so recorded the record thereof so made shall be received in any court of the state as prima facie evidence of the due passage of such ordinance as recorded. When the ordinances of any city or town are printed by authority of such municipal corporation, the printed copies thereof shall be received as prima facie evidence that such ordinances as printed and published were duly passed.

7

No. 55663-4-II

The trial court granted the County's motion to dismiss, noting that it considered the records and files, and that it took judicial notice of the public records under ER 201.[6] The court dismissed the McCartneys' complaint with prejudice and entered judgment in favor of the County.

The McCartneys appeal.

ANALYSIS

The McCartneys argue that the trial court erred when it granted the County's CR 12(c) motion for judgment on the pleadings. They argue that the trial court erred in taking judicial notice of the public records the County submitted. The McCartneys also argue that the County has no discretionary immunity because the decisions made regarding staffing were operational decisions and not policy decisions. To support this argument, the McCartneys argue that the County failed to provide a safe workplace for Deputy McCartney as required by workplace safety laws, and that the workplace standards are nondiscretionary. The McCartneys further argue that the professional rescuer doctrine does not bar relief. The McCartneys then argue that we should remand for the trial court to issue a writ of mandamus to compel the County to "mitigate the safety hazards its serious staffing shortages cause," and that the public records the court took notice of created genuine issues of material fact. Br. of Appellant at 45.

We hold trial court did not err when it took judicial notice of the public records under ER 201. We also hold that police staffing decisions are a legislative, discretionary decision, and that the professional rescuer doctrine also bars the McCartneys from recovering. Likewise, the

---

[6] ER 201 governs judicial notice of adjudicative facts.

No. 55663-4-II

discretionary nature of the County's decisions make a writ of mandamus inappropriate. Finally, we hold that the public records did not create a genuine issue of material fact.

## I. STANDARD OF REVIEW

We review CR 12(c) motions for judgment on the pleadings de novo. *Aji P.*, 16 Wn. App. 2d at 187. Our review is identical to that which we use for a CR 12(b)(6) motion to dismiss. *Wash. Trucking Ass'ns v. Emp't Sec. Dep't*, 188 Wn.2d 198, 207, 393 P.3d 761 (2017). Dismissal under CR 12(c) is appropriate when it appears beyond doubt the plaintiff cannot prove any set of facts that would justify recovery. *Aji P.*, 16 Wn. App. 2d at 187. We take all facts alleged in the complaint as true, and we may consider hypothetical facts that support the plaintiff's claim that are not in the record. *Aji P.*, 16 Wn. App. 2d at 187.

## II. JUDICIAL NOTICE OF PUBLIC RECORDS

The McCartneys argue that the trial court erred when it took judicial notice of the online county records the County linked to in its motion to dismiss. We disagree.

We review the trial court's decision to consider evidence for an abuse of discretion. *Salas v. Hi–Tech Erectors*, 168 Wn.2d 664, 668, 230 P.3d 583 (2010). A trial court abuses its discretion when it renders a decision that is manifestly unreasonable or based upon untenable grounds or reasons, or when the court applies the wrong legal standard. *Salas*, 168 Wn.2d at 669.

ER 201(b) provides: "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." On a ruling on a motion to dismiss, the trial court may take judicial

No. 55663-4-II

notice of public documents if their authenticity cannot be reasonably disputed. *Rodriguez v. Loudeye Corp.*, 144 Wn. App. 709, 725-26, 189 P.3d 168 (2008). "Documents whose contents are alleged in a complaint but which are not physically attached to the pleading may also be considered in ruling on a CR 12(b)(6) motion to dismiss." *Rodriguez*, 144 Wn. App. at 726. And as noted above, our review under CR 12(c) is identical to that in CR 12(b)(6). *Wash. Trucking*, 188 Wn.2d at 207.

In its motion to dismiss, the County included information from the public record, including Council resolutions, committee meeting minutes, and committee meeting recordings in which the Council was presented with emergency statistics, response times, recruiting efforts, and hiring and training information. The records themselves were hyperlinked in a footnote and not physically attached to the motion. The links were all to the official Pierce County website. The authenticity of the records cannot be reasonably disputed, and the McCartneys do not raise such a dispute.

The McCartneys argue that the County was required to submit its records into evidence under ER 1005, and certify the records and submit them as evidence under RCW 5.44.040 and .080. We disagree because those statutes do not compel parties to submit public records as evidence, but rather mandate that if a party does submit certified public records, they "must be admitted in evidence." RCW 5.44.040. Likewise, "city or town" ordinances "shall be received in any court of the state as prima facie evidence of the due passage of such ordinance as recorded." RCW 5.44.080. These statutes have no bearing on what a court may take judicial notice of. This argument fails.

10

No. 55663-4-II

The record here shows that the trial court took judicial notice of the County's public records after oral argument and supplemental briefing examining the law surrounding ER 201 and the above statutes. Accordingly, we hold that the trial court made a reasoned decision and did not abuse its discretion when it took judicial notice of the public records.

III. DISCRETIONARY IMMUNITY

The McCartneys argue that the County does not have discretionary immunity from suit here because the County's staffing decisions were not discretionary. The County argues that law enforcement funding, staffing, and implementation decisions are discretionary decisions of the Council and the elected Pierce County Sheriff (Sheriff) that are immune from suit. We agree with the County.

A. *Legal Principles*

Our legislature has waived sovereign immunity for local governmental entities. RCW 4.96.010; *see Mancini v. City of Tacoma*, 196 Wn.2d 864, 883, 479 P.3d 656 (2021). However, our Supreme Court has created the "very narrow exception of discretionary governmental immunity" to "prevent the courts from passing judgment on basic policy decisions that have been committed to coordinate branches of government." *Mancini*, 196 Wn.2d at 883-84 (quoting *Bender v. City of Seattle*, 99 Wn.2d 582, 587-88, 664 P.2d 492 (1983)) (internal quotation marks omitted). High level, executive discretionary acts fall within the exception. *Chambers-Castanes v. King County*, 100 Wn.2d 275, 281, 669 P.2d 451 (1983). Discretionary acts at an operational level do not. *Chambers-Castanes*, 100 Wn.2d at 282.

Thus, "police lack discretionary governmental immunity for their investigative and other 'everyday operational level' acts." *Mancini*, 196 Wn.2d at 884. However, a police department's

11

No. 55663-4-II

determinations on how to use law enforcement resources available to it are legislative-executive decisions. *Walters v. Hampton*, 14 Wn. App. 548, 553, 543 P.2d 648 (1975). The allocation of limited police resources "is neither a traditional nor appropriate role for the courts to assume." *Walters*, 14 Wn. App. at 553. To hold otherwise would "make the [county] an insurer against every harm imposed by a criminal act." *Walters*, 14 Wn. App. at 553.

To determine whether the County's deputy staffing decisions fall within the discretionary immunity exception, we apply the four-part test our Supreme Court set out in *Evangelical United Brethren Church of Adna v. State*, 67 Wn.2d 246, 255, 407 P.2d 440 (1965). "The *Evangelical* test determines whether a particular discretionary act is so rooted in governing that it cannot be tortious, no matter how 'unwise, unpopular, mistaken, or neglectful [it] might be.'" *Gorman v. Pierce County*, 176 Wn. App. 63, 76, 307 P.3d 795 (2013) (quoting *Evangelical*, 67 Wn.2d at 253) (alteration in original).

The *Evangelical* test asks:

(1) Does the challenged act, omission, or decision necessarily involve a basic governmental policy, program, or objective? (2) Is the questioned act, omission, or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program, or objective? (3) Does the act, omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved? (4) Does the governmental agency involved possess the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision?

67 Wn.2d at 255. If these questions can clearly be answered in the affirmative, then the challenged government decision falls within the exception, "regardless of its unwisdom." *Evangelical*, 67 Wn.2d at 255.

No. 55663-4-II

In *King v. City of Seattle*, our Supreme Court added a fifth factor to the *Evangelical* test: to be entitled to immunity the defendant must show that the policy decision was made after consciously balancing risks and advantages in a "considered decision." 84 Wn.2d 239, 246, 525 P.2d 228 (1974), *overruled on other grounds by City of Seattle v. Blume*, 134 Wn.2d 243, 947 P.2d 223 (1997).

B. *Application of the* Evangelical *Test*

1. *Basic Governmental Policy, Program, or Objective*

Providing officers to enforce laws is a uniquely governmental objective. It is axiomatic that local governments "provide for and . . . further the general health, order, peace, and morality, and . . . provide justice for those governed. The creation and maintenance of police departments is basic to the accomplishment of those purposes." *Walters*, 14 Wn. App. at 551 (citation omitted). The funding relating to the staffing of the Sheriff's Department and the department's decision on where to allocate officers are basic governmental policy decisions.

The McCartneys appear to argue that the Washington Constitution provides that professions that are "dangerous to life or deleterious to health" require nondiscretionary protections. CONST. art. II, § 35. But the full text of the constitutional section states, "*The legislature shall pass* necessary laws for the protection of persons working in mines, factories and other employments dangerous to life or deleterious to health; and fix pains and penalties for the enforcement of the same." CONST. art. II, § 35 (emphasis added). This is a mandate on the legislature, not local governments. And the McCartneys cite to no source where it applies in the law enforcement context. The first *Evangelical* question is answered in the affirmative.

13

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 55663-4-II

2. *Decision Essential to Accomplishing Government Objective*

The second *Evangelical* question asks, "Is the questioned act, omission, or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program, or objective?" 67 Wn.2d at 255. This, too, is answered in the affirmative.

Here, the questioned decision was the County's staffing of the Sheriff's Department to enforce the law. The hiring, retention, training, and regional allocation of sheriff deputies are all essential to the basic government objective of providing law enforcement. "[M]aintenance of police departments is basic to the accomplishment of" the basic government function of providing peace, morality, and justice. *Walters*, 14 Wn. App. at 551. Moreover, decisions regarding the hiring and allocation of law enforcement officers would change the course of the government's objective of public safety. For example, hiring too many deputies could financially strain the county, and putting too many deputies in areas with low populations could result in a dearth of law enforcement response in highly populated areas.

The McCartneys attempt to redefine the County's objective in staffing the Sheriff's Department as one to further workplace safety. In this vein, the McCartneys cite to workplace safety statutes to argue that the County made no decision on deputies' safety in the workplace when it made staffing decisions.[7] But this is beside the point. When deciding how to properly

---

[7] "The welfare of the state of Washington demands that all employees be protected from conditions of labor which have a pernicious effect on their health. The state of Washington, therefore, exercising herein its police and sovereign power declares that inadequate wages and unsanitary conditions of labor exert such pernicious effect." RCW 49.12.010. "It shall be unlawful to employ any person in any industry or occupation within the state of Washington under conditions of labor detrimental to their health." RCW 49.12.020.

14

No. 55663-4-II

staff Sheriff's deputies, the County's objective was public safety. The McCartneys' complaint tied *officer* safety directly to staffing decisions. But the County's discretionary decision here involved *public* safety. Providing a law enforcement presence to the county, and the manner in which to accomplish that presence through the allocation of resources, is the government decision that was made here.

Likewise, the McCartneys further argue that correcting deputies' workplace safety would not change the course or direction of workplace safety. But as explained above, workplace safety was not the objective the County was attempting to realize when it made its decisions on deputy staffing and allocation. Therefore, the second *Evangelical* question is answered in the affirmative.

3. *Requiring the Exercise of Policy Evaluation, Judgment, and Expertise*

The County's decisions on Sheriff's Department funding and staffing is a basic policy judgment that requires the evaluation, judgment, and expertise of county officials. To make such decisions, the Council and Sheriff must make budget considerations and have knowledge of hiring trends, criminal statistics, population densities, and other factors. We will not place ourselves in a position of "having to determine how limited police resources are to be allocated," but instead we leave these decisions to local government. *Walters*, 14 Wn. App. at 553.

Here the McCartneys' complaint makes it clear that the County considered multiple audits from outside consultants and that Sheriff's Department leadership had a large geographic area with a range of enforcement needs. This shows that county officials had to use their judgment to make policy evaluations based on their expertise in the law enforcement needs of their local government.

15

No. 55663-4-II

The McCartneys cite *Mason v. Bitton*, 85 Wn.2d 321, 534 P.2d 1360 (1975), to argue that the County was acting outside of its discretionary functions. *Mason* involved a high-speed chase where Bitton, the subject of the pursuit, crashed into an innocent bystander's car, killing its occupants. 85 Wn.2d at 323. The victim's estate sued Bitton, the State, and Seattle, alleging the manner of pursuit was negligent. *Mason*, 85 Wn.2d at 323. But, as the *Mason* court held, the decisions made during an active law enforcement pursuit of a suspect are operational. 85 Wn.2d at 328. The decision that led to the killing in *Mason* bears little resemblance to the decisions county officials made months and years removed from the incident which caused McCartney's death. Indeed, the *Mason* court distinguished such decisions from those that are "administrative." 85 Wn.2d at 328. Decisions made by the elected Sheriff and Council on hiring staff are administrative. *Mason* is inapt.

Next, the McCartneys cite *Estate of Jones v. State*, 107 Wn. App. 510, 522, 15 P.3d 180 (2000), to argue that the County did not have discretionary immunity because there is no such immunity for inadequate supervision. In *Jones*, a convict escaped from juvenile rehabilitation housing, broke into a home, and raped and murdered a 12 year old girl. 107 Wn. App. at 514-17. The girl's estate sued, and Division One of this court held that the State was not immune from suit for negligent supervision of the parolee. *Estate of Jones*, 107 Wn. App. at 522-23. The *Jones* court determined the *Evangelical* factors did not apply because supervision of the parolee was a low level, operational matter, not a policy decision. 107 Wn. App. at 522-23. But the day-to-day supervision of a criminal assigned to a rehabilitation facility is a far cry from the decisions made by elected officials regarding staffing. The decisions the County made regarding deputy

16

No. 55663-4-II

hiring and allocation, though supervisory, are not the same as the low-level supervision of a parolee. The third *Evangelical* question is answered in the affirmative.

4. *The Lawful Authority to Make the Decision*

The fourth *Evangelical* question asks whether the governmental agency involved possesses the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged decision. 67 Wn.2d at 255. The County and Sheriff's Department do so here.

The Sheriff's duties are provided in RCW 36.28.010, and give the Sheriff discretion to "call to their aid such persons, or power of their county as they may deem necessary." RCW 36.16.070 provides that county officers may employ deputies to perform acts the officer is authorized to perform. Accordingly, the County and Department's decisions on law enforcement staffing are provided by statute.

The McCartneys argue that the County's staffing decisions were outside its lawful authority because it created an unsafe workplace. But this is just a disguised argument that the decision was a poor one; it is clear that the County had the authority to make staffing decisions. The fourth *Evangelical* question is answered in the affirmative.

5. *Considered Decision*

Finally, for discretionary immunity to apply, the County must have made a "considered decision" that was made after consciously balancing risks and advantages. *King*, 84 Wn.2d at 246. The County did so here.

As explained above, the County considered multiple audits from outside consultants, and that the Sheriff's Department leadership had a large geographic area with a range of enforcement needs. Furthermore, in its motion, the County included information from the public record,

17

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 55663-4-II

including Council resolutions, committee meeting minutes, and committee meeting recordings in which the Council was presented with emergency statistics, response times, recruiting efforts, and hiring and training information relevant to staffing. This all shows that the County had ample information before it, and made staffing decisions based on a wide variety of factors. This was a considered decision.

Each factor from *Evangelical* and its progeny shows that the County's staffing resource and implementation decisions are discretionary acts rooted in governing.

C. *Workplace Safety Laws*

The McCartneys argue that discretionary immunity is not applicable because the County's staffing decisions are workplace safety issues. Thus, the McCartneys argue, the County's decisions on staffing are not immune from suit because workplace safety standards are not discretionary. Although it is true that workplace safety standards are not discretionary, we disagree that those standards remove the County's discretion to staff the Sheriff's Department as the elected officials see fit.

1. *Employer Immunity*

Under the worker compensation laws, law enforcement organizations are exempt from employer immunity. The Law Enforcement Officers' and Firefighters' Retirement System provides a cause of action, stating:

> If injury or death results to a member from the intentional or negligent act or omission of a member's governmental employer, the member, the widow, widower, child, or dependent of the member shall have the privilege to benefit under this chapter and also have cause of action against the governmental employer as otherwise provided by law, for any excess of damages over the amount received or receivable under this chapter.

18

No. 55663-4-II

RCW 41.26.281. Although this statute creates a statutory duty for local governments not to injure employee police officers by negligent acts or omissions, it does not change the discretionary nature of a governmental entity's high level policy decisions. The McCartneys cite to no workplace safety law that changes the discretionary nature of these decisions, nor do they cite to any workplace safety law that compels counties to ensure a certain number of sheriff deputies are assigned to certain patrols in certain areas. Moreover, the County did not allege in its motion that it was immune from suit under the worker's compensation scheme; it argued discretionary immunity.

Not only does no statute remove the County's discretion to allocate funding resources and to staff employees of the Sheriff's Department, our courts have long held that they will not interfere in such decisions. *See, e.g.*, *State ex rel. Farmer v. Austin*, 186 Wash. 577, 583-84, 59 P.2d 379 (1936) (holding courts will not issue mandamus to prevent county commissioners from reducing sheriff's department staff); *Walters*, 14 Wn. App. at 553 (holding it is inappropriate for courts to provide relief in tort to a citizen who sued the city for its negligence to protect him from a criminal attack).

The McCartneys argue that courts have not barred claims by officers against a law enforcement employer when officers were injured on the job. However, the cases the McCartneys cite did not involve high level policy decisions but rather involved officers who were injured by other responding officers. *Beaupre v. Pierce County*, 161 Wn.2d 568, 570, 166 P.3d 712 (2007) (officer injured when fellow officer struck him with a patrol car); *Elford v. City of Battle Ground*, 87 Wn. App. 229, 231, 941 P.2d 678 (1997) (officer bitten by police dog); *Strachan v. Kitsap County*, 27 Wn. App. 271, 272, 616 P.2d 1251 (1980) (officer accidentally

19

No. 55663-4-II

shot by fellow officer). And in *Fray v. Spokane County*, 134 Wn.2d 637, 641-42, 952 P.2d 601 (1998), our Supreme Court held that the Law Enforcement Officers' and Firefighters' Retirement System created a cause of action for an officer injured by a criminal assailant such that the suit was not barred by the Industrial Insurance Act, but the court did not address the county's discretionary acts.

2. *Workplace Safety Standards*

The McCartneys further argue that workplace safety laws create non-discretionary standards that the County must follow to provide deputies with a safe workplace. Although the County is subject to workplace safety standards, and must ensure law enforcement employees have a safe workplace, such standards do not define what amounts to "safe" staffing levels or allocations of law enforcement officers. These decisions are discretionary. RCW 36.28.010(6) (the Sheriff "*may* call to their aid such persons . . . as they may deem necessary" (emphasis added)).

The McCartneys cite multiple statutes and regulations that mandate a safe workplace.[8] But the allegations in the McCartneys' complaint regarding deputy safety are tied to staffing shortages. None of the statutes or regulations the McCartneys cite provide any standard for law

---

[8] The McCartneys cite the following statutes: RCW 49.12.010 states, "The welfare of the state of Washington demands that all employees be protected from conditions of labor which have a pernicious effect on their health. The state of Washington, therefore, exercising herein its police and sovereign power declares that inadequate wages and unsanitary conditions of labor exert such pernicious effect." RCW 49.12.020 states, "It shall be unlawful to employ any person in any industry or occupation within the state of Washington under conditions of labor detrimental to their health." WAC 296-126-094 states, "It shall be the responsibility of every employer to maintain conditions within the work place environment that will not endanger the health, safety or welfare of employees. All facilities, equipment, practices, methods, operations and procedures shall be reasonably adequate to protect employees' health, safety and welfare." *See also* WAC 296-800-110 et seq.–Employer Responsibilities: Safe Workplace.

No. 55663-4-II

enforcement staffing, let alone a non-discretionary standard.  The McCartneys' arguments invite

court interference as to how much backup, supervision, or how many patrol officers assigned to a

given area would be "reasonably adequate to protect" deputies' health, safety, and welfare.

These questions are within the discretion of the County and the Sheriff, not the courts.  *Farmer*,

186 Wash. at 583-84.  Workplace safety laws are not specific enough to remove the County's

discretion on law enforcement staffing.  *See Colvin v. Inslee*, 195 Wn.2d 879, 893, 467 P.3d 953

(2020) (holding mandamus is appropriate only where "'the law prescribes and defines the duty to

be performed with such precision and certainty as to leave nothing to the exercise of discretion or

judgment'" (quoting *SEIU Healthcare 775NW v. Gregoire*, 168 Wn.2d 593, 599, 229 P.3d 774

(2010))).

Next, the McCartneys' cite published Sheriff's Department standards to argue that the

County did not adequately provide the resources to create a safe workplace under those

standards.  But the Council is not obligated to fund everything that might be inferred from a

given standard.[9]

We hold that governmental discretionary immunity applies.  The County's decisions on

funding allocation for staffing and sheriff deputy allocation fall within the discretionary

---

[9] To the extent the McCartneys argue that the County created an unsafe workplace by insufficiently training him, the McCartneys admits in their complaint that deputies were asked to wait for backup on dangerous calls.  The complaint also states numerous times that deputies assigned to district 10 knew that backup could be "many miles and many minutes" away.  CP at 4.  McCartney was a veteran officer with 4 years' experience in Pierce County and another 5 years' previous police experience.  Even though the incident here was in district 7, McCartney was familiar with working in the remote district 10 area and knew backup could take time to arrive.  He chose to pursue a suspect on foot, in the dark.  He was shot by a fleeing criminal.  Nothing the McCartneys cite create a nondiscretionary standard that could alleviate such a "pernicious effect."  *See* RCW 49.12.010.

No. 55663-4-II

exemption provided in *Evangelical* and its progeny. Workplace safety laws do not define with specificity how local law enforcement staffing decisions can ameliorate such risks. We will not impose our judgment as to how the County allocates resources to staff the Sheriff's Department.[10]

## IV. PROFESSIONAL RESCUER DOCTRINE

The McCartneys argue that the professional rescuer doctrine does not bar relief. The County argues that the professional rescuer doctrine is not limited to parties being rescued, and that McCartney's death was "inherently within the ambit of those dangers which are unique to and generally associated with the particular rescue activity." *Maltman v. Sauer*, 84 Wn.2d 975, 979, 530 P.2d 254 (1975); Br. of Resp't at 53-54. We agree with the County and hold that the professional rescuer doctrine applies.

### A. *Legal Principles*

"[T]he 'rescue doctrine' is intended to provide a source of recovery to one who is injured while reasonably undertaking the rescue of a person who has negligently placed himself in a position of imminent peril." *Maltman*, 84 Wn.2d at 976-77. Under the rescue doctrine, a person who negligently placed themselves in peril can be liable for damages incurred by the rescuer. *Maltman*, 84 Wn.2d at 976-77. The *professional* rescuer doctrine is an exception to this general rule. *Loiland v. State*, 1 Wn. App. 2d 861, 865, 407 P.3d 377 (2017).

---

[10] Public policy supports this holding. To hold otherwise would invite lawsuits against the County for every officer injured by a criminal act of violence outside of the County's control. We will not "make the [County] an insurer against every harm imposed by a criminal act." *Walters*, 14 Wn. App. at 553. Beyond having the result of holding County taxpayers liable for individual criminal acts against police officers, allowing such negligence claims to proceed would dissuade local governments, ex ante, from sending law enforcement professionals into dangerous situations.

No. 55663-4-II

"The professional rescuer doctrine is based on a broad policy of assumption of risk." *Markoff v. Puget Sound Energy, Inc.*, 9 Wn. App. 2d 833, 840, 447 P.3d 577 (2019). "The professional rescue doctrine bars professional rescuers from recovering under the rescue doctrine because a professional rescuer assumes certain hazards 'not assumed by a voluntary rescuer.'" *Beaupre*, 161 Wn.2d at 572 (quoting *Maltman*, 84 Wn.2d at 978).

"A professional rescuer assumes certain risks as part of his or her job and is compensated for accepting those risks." *Loiland*, 1 Wn. App. 2d at 865. The professional rescuer may not recover where "the hazard ultimately responsible for causing the injury is inherently within the ambit of those dangers which are unique to and generally associated with the particular rescue activity." *Loiland*, 1 Wn. App. 2d at 865 (quoting *Maltman*, 84 Wn.2d at 979) (internal quotation marks omitted). We broadly apply this doctrine to bar recovery for anyone who is fully aware of a hazard caused by another's negligence and who voluntarily confronts the risk for compensation. *Black Indus., Inc. v. Emco Helicopters, Inc.*, 19 Wn. App. 697, 699-700, 577 P.2d 610 (1978). However, the professional rescuer doctrine does not bar a professional from recovering in all cases where he or she is injured in the line of duty. *Loiland*, 1 Wn. App. 2d at 866.

In *Loiland*, Division One explained the rules courts in this state have employed to determine whether the professional rescuer doctrine applies:

> The doctrine does not apply where a professional rescuer is injured by a "'hidden, unknown, [or] extrahazardous'" danger that is not inherently associated with the particular rescue activity. *Maltman*, 84 Wn.2d at 978 (quoting *Jackson v. Velveray Corp.*, 82 N.J. Super. 469, 198 A.2d 115, 119 (1964)). Similarly, the professional rescuer doctrine does not bar recovery where the rescuer is injured by the act of an intervening third party. *Ballou* [*v. Nelson*], 67 Wn. App. [67,] 70, 834 P.2d 97 [(1992)]; *Ward v. Torjussen*, 52 Wn. App. 280, 287, 758 P.2d 1012 (1988). The doctrine "'relieves the perpetrator of the act that caused the rescuer to be at the

23

No. 55663-4-II

scene. . . .'" *Beaupre v. Pierce County*, 161 Wn.2d 568, 573, 166 P.3d 712 (2007) (quoting *Ward*, 52 Wn. App. at 287, 758 P.2d 1012). It "does not apply to negligent or intentional acts of intervening parties not responsible for bringing the rescuer to the scene." [*Beaupre*, 161 Wn.2d] at 575, 166 P.3d 712.

1 Wn. App. 2d at 866.

B.      *Professional Rescuer Doctrine Applies*

We examine each rule associated with the professional doctrine, and conclude that the doctrine applies here to bar the McCartneys' claims.

1.  *Hidden, Unknown, or Extrahazardous Danger Not Inherently Associated with the Particular Rescue Activity*

The McCartneys argue that the professional rescuer doctrine does not apply because the County created an unknown and extrahazardous risk by creating an unsafe workplace not inherent to law enforcement. The County argues the danger was not unknown and that it was inherently associated with McCartney's rescue activity. We agree with the County.

McCartney quickly and readily responded to the scene of an apparently violent crime. He confronted an armed suspect, at night, on a solo patrol. This was a risk "'inherently within the ambit of those dangers which are unique to and generally associated with'" law enforcement, and was especially inherent in responding to a violent crime. *Loiland*, 1 Wn. App. 2d at 865 (quoting *Maltman*, 84 Wn.2d at 979). The danger of facing an armed suspect was inherently associated with McCartney's rescue activity.

The McCartneys cite *Ballou v. Nelson*, 67 Wn. App. at 73, to argue that the professional rescuer doctrine does not apply because McCartney was not conducting a "rescue." Br. of Appellant at 35. In *Ballou*, Division 1 of this court held that a criminal who injured a police officer was not shielded by the professional rescuer doctrine for two reasons: first, because the

24

No. 55663-4-II

defendants intentionally assaulted the officer, and the doctrine applies to negligence; and second, because the officers were not conducting a rescue but instead responding to a bar fight. 67 Wn. App. at 70. But *Ballou* is distinguishable.

First, the defendant here is the officer's employer, and has no relation to the criminal who committed the crime against the officer. And the McCartneys allege that the County is negligent, not that it intentionally killed McCartney; it is apparent that Pawul and his accomplices were responsible for the intentional act. Second, officers responding to break up a bar fight may not be rescuing someone, but an officer responding to a family, with children, in a home being held at gunpoint while their home is robbed certainly is. The McCartneys' arguments to the contrary strain credulity. Accordingly, this exception to the professional rescuer doctrine does not apply.

2. *Injury to Rescuer Caused by the Negligent Act of an Intervening Third Party*

The professional rescuer doctrine does not apply to a third party where the rescuer is injured by the negligent or intentional acts of that intervening third party. *Ballou*, 67 Wn. App. at 70, 72. This exception does not apply here.

Pawul and his accomplices were an intervening third party. Thus, the professional rescuer doctrine does not bar the McCartneys from recovering against *them*. But this dispute is not between the McCartneys and Pawul and his accomplices. Moreover, "to invoke the doctrine the defendant must be guilty of some negligence toward the rescuer after he, the rescuer, has begun to attempt the rescue." *Maltman*, 84 Wn.2d at 982 (quoting *Hawkins v. Palmer*, 29 Wn.2d 570, 575, 188 P.2d 121 (1947)) (internal quotation marks omitted). Put another way, for this exception to the professional rescuer doctrine to apply, the County must have committed a

25

No. 55663-4-II

negligent, intervening act *after* McCartney began the rescue attempt. Here, however, the County's negligent act that the McCartneys alleged caused the injury—its staffing decisions regarding the Sheriff's Department—took place well before McCartney began the rescue. Accordingly, the County is not an intervening party.

The McCartneys cite *Beaupre*, 161 Wn.2d at 575, to argue that the doctrine does not apply to "intervening parties not responsible for bringing the rescuer to the scene." Br. of Appellant at 38. Although the doctrine does not apply to intervening parties, as explained above, the County was not one.

In *Beaupre*, Pierce County sheriff's deputies took part in a high-speed chase. 161 Wn.2d at 570. When the suspect slowed, Sheriff's Sergeant Beaupre exited his vehicle and was subsequently struck and injured by another Pierce County sheriff patrol car. 161 Wn.2d at 570. Beaupre sued the county for negligence. 161 Wn.2d at 571. Our Supreme Court held "as a matter of law that the professional rescue doctrine does not bar Beaupre's suit against his employer." 161 Wn.2d at 570. The county argued that the county was not an intervening party. *Beaupre*, 161 Wn.2d at 573. The court rejected this argument and held that the professional rescue doctrine did not bar Beaupre's lawsuit, stating, "The doctrine does not apply to negligent or intentional acts of intervening parties not responsible for bringing the rescuer to the scene." *Beaupre*, 161 Wn.2d at 575.

Here, the McCartneys alleged that Deputy McCartney taking on the extra shift was due in part to the County's negligent understaffing of the deputy ranks. CP at 5 ("with the agency understaffed, Deputy McCartney agreed to cover the fellow deputy's graveyard shift"). Thus, any negligence on the part of the County took place before McCartney began his rescue attempt,

26

No. 55663-4-II

and there was no such intervening act by the County. *Beaupre* applies only where the employer is "guilty of some negligence toward the rescuer after he, the rescuer, has begun to attempt the rescue." *Maltman*, 84 Wn.2d at 982; *cf. Beaupre*, 161 Wn.2d at 571-72. Accordingly, this exception to the professional rescue doctrine does not apply and does not allow the McCartneys to recover.

3. *Relief for the Perpetrator of the Act that Caused the Rescuer to Be at the Scene*

The McCartneys argue that the only party that may be relieved under the professional rescuer doctrine is the party who caused the rescuer, McCartney, to be at the scene. We disagree because the doctrine is broader than what the McCartney's argue.

Under the original application of the professional rescuer doctrine, the "perpetrator of the act that caused the rescuer to be at the scene" meant the person being rescued. For example, a firefighter may not recover from the victim of a fire he rescued, barring unforeseeable hidden, unknown, or extrahazardous dangers. *See Maltman*, 84 Wn.2d at 978. Likewise, a police officer who has pulled over a car, then was injured by a different passing motorist, may recover against the passing motorist but not the driver of the stopped car. *See Sutton v. Shufelberger*, 31 Wn. App. 579, 587-88, 643 P.2d 920 (1982). Using these examples as an analogy, the "perpetrator" who caused McCartney to be at the scene was the victim of the burglary.

But as the *Loiland* court explained, the professional rescuer doctrine applies both when the injury is not caused by an intervening third party, and where a party's negligence caused the professional rescuer's presence at the scene but the rescuer "is injured by a hazard that is 'inherently within the ambit of those dangers which are unique to and generally associated with the particular rescue activity.'" 1 Wn. App. 2d at 865 (quoting *Maltman*, 84 Wn.2d at 979).

27

No. 55663-4-II

Thus, assuming without deciding that the County's negligence brought McCartney to the scene, McCartney's response to the home invasion call was inherently associated with the hazard he encountered. *Cf. Ward*, 52 Wn. App. at 287 (holding an officer's response to a prowler assist call does not inherently involve the hazard of being struck in a traffic collision). Accordingly, this argument fails.

C. *The McCartneys' Additional Arguments*

The McCartneys make two additional arguments to why the professional rescuer doctrine should not apply. Both fail.

1. *Workplace Safety and the Professional Rescuer Doctrine*

The McCartneys argue that the professional rescuer doctrine does not apply because the County created unsafe working conditions that McCartney could not have assumed. We disagree.

The very basis of the professional rescuer doctrine is that certain professions come with inherent risks that employees assume in exchange for compensation. *Loiland*, 1 Wn. App. 2d at 865; *Black Indus.*, 19 Wn. App. at 699-700. Law enforcement is a dangerous profession. *State v. Flores*, 186 Wn.2d 506, 523 n.6, 379 P.3d 104 (2016) (listing statistics demonstrating the dangers police officers face).[11] Enforcing the law requires officers to take certain risks in order to provide for public safety. Responding to the scene of an armed home invasion is no exception.

---

[11] "The majority's . . . footnote's statistics certainly show that law enforcement in general is a dangerous profession." *Flores*, 186 Wn.2d at 535 (McCloud, J., dissenting).

No. 55663-4-II

The McCartneys attempt to frame this as a workplace safety issue, citing *Siragusa v. Swedish Hosp.*, 60 Wn.2d 310, 320, 373 P.2d 767 (1962), for the general rule that an employee does not assume risks arising from the employer's negligence. But this attempts to sidestep the professional rescuer doctrine by ignoring the distinction between the risk assumed in an inherently dangerous rescue operation—that happens to be a part of the job—and those risks created by a workplace that is improperly unsafe. Indeed, if workplace safety were to trump the professional rescuer doctrine, then the professional rescuer doctrine could never apply; the workplace that involves a dangerous rescue that employees volunteer to undertake is unsafe in spite of these rules. McCartney assumed this risk when he responded to the 911 dispatch.

2. *Spontaneous Risks*

The McCartneys then argue that Deputy McCartney could not assume the risk here because he reacted spontaneously. We disagree.

The McCartneys cite *Kirk v. Wash. State Univ.*, 109 Wn.2d 448, 453, 746 P.2d 285 (1987), to argue that to show McCartney assumed the risk, the evidence must show "(1) had full subjective understanding (2) of the presence and nature of the specific risk, and (3) voluntarily chose to encounter the risk." *Kirk* was a case where a cheerleader fell during an unsanctioned practice and broke her elbow. 109 Wn.2d at 450. But, as explained above, the professional rescuer doctrine is more than assumption of risk, and *Kirk* has never been applied to the doctrine. To the extent *Kirk* applies at all, the *Kirk* elements are satisfied, and the McCartneys' argument fails.

McCartney was an experienced officer. He had worked for nine years in two police departments. Dispatch informed McCartney of what kind of call he was responding to. He knew

29

No. 55663-4-II

that backup could be "many miles and many minutes" away. CP at 4. The County also instructed deputies to wait for backup in these situations. This was not a spontaneous reaction. This was a professional law enforcement officer deliberately responding to a crime and doing his duty.

Accordingly, we hold that McCartney, as a professional rescuer, assumed the risk when he went to the scene of the crime as a law enforcement officer in an attempt to rescue a family held at gunpoint. Thus, this argument fails.

## V. WRIT OF MANDAMUS

The McCartneys argue that we should remand to the trial court to issue a writ of mandamus to compel the County to "correct unsafe workplace conditions." Br. of Appellant at 44. The County argues that mandamus is inappropriate when a government entity makes discretionary decisions about police officer staffing. We agree with the County.

A. *Legal Principles*

A writ of mandamus is a "rare and extraordinary remedy" that requires courts to order another branch of government to take a specific action. *Colvin*, 195 Wn.2d at 890. "A writ of mandamus can only command what the law itself commands. If the law does not require a government official to take a specific action, neither can a writ of mandamus." *Colvin*, 195 Wn.2d at 893. Thus, as our Supreme Court explained, "[M]andamus may not be used to compel the performance of acts or duties which involve discretion on the part of a public official." *SEIU Healthcare*, 168 Wn.2d at 599 (quoting *Walker v. Munro*, 124 Wn.2d 402, 410, 879 P.2d 920 (1994)) (internal quotation marks omitted).

No. 55663-4-II

A court may issue a writ of mandamus only where three elements are satisfied: (1) There is a clear duty for a governmental official to act such that "the law prescribes and defines the duty to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment." *Colvin*, 195 Wn.2d at 893. (2) The party seeking the writ has no "plain, speedy and adequate remedy in the ordinary course of law." RCW 7.16.170; *Colvin*, 195 Wn.2d at 894. And (3) the party seeking the writ must be "beneficially interested" such that the party has an interest in the writ beyond that shared in common with other citizens. *Retired Pub. Emps. Council of Wash. v. Charles*, 148 Wn.2d 602, 616, 62 P.3d 470 (2003).

B. *Application of Mandamus Requirements*

The McCartneys argue that they qualify for a writ of mandamus by fulfilling all three elements. We disagree.

On the first element, the McCartneys argue that workplace safety laws create mandates that remove the County's discretion. We disagree. As explained in Part III, *supra*, there is no workplace safety law that states with specificity exact staffing and personnel allocation requirements for county sheriff's departments such that it "leave[s] nothing to the exercise of discretion or judgment." *Colvin*, 195 Wn.2d at 893.

Our courts will not issue mandamus to order counties to adjust the staffing of their sheriff's departments. *Farmer*, 186 Wash. at 583-84. "Courts will not by mandamus attempt to control the discretion of subordinate bodies acting within the limits of discretion vested in them by law." *Farmer*, 186 Wash. at 583-84.

The *Farmer* court held that the staffing of sheriff's departments is not a decision for the courts.

31

No. 55663-4-II

> If it be assumed that the business of the sheriff's office will be hampered [by] the reduction in force, the harm will not be nearly as great as would be the consequences of the interference by the courts with the executive duties of the board of county commissioners, in whom is reposed the financial management of the county's affairs.

*Farmer*, 186 Wash. at 588.  Likewise, the *SEIU Healthcare* court explained that the allocation of funds in a budget necessarily involves the discretion of an elected official.  168 Wn.2d at 600 ("the allocation of limited state funds in order to achieve the statutorily required balanced budget necessarily involves the exercise of the governor's discretion"); *see also Smith v. Bd. of Walla Walla County Comm'rs*, 48 Wn. App. 303, 305, 738 P.2d 1076 (1987) (reversing a writ of mandate ordering county commissioners to reinstate and fund an employee position).

Though *Farmer* was decided long ago, the statutes providing counties and sheriff's departments with the authority to hire deputies and delegate the sheriff's responsibilities still include such discretionary language.  *See State v. Bartholomew*, 104 Wn.2d 844, 848, 710 P.2d 196 (1985) (use of "may" and "shall" in a statute indicates that the legislature intended the two words to have different meanings: "may" being directory, while "shall" being mandatory).

Under RCW 36.16.070, a county officer "may employ deputies" and the county board "shall fix their compensation."  This does not create a requirement that eliminates county officials' discretion.  Similarly, RCW 36.28.010(6) provides that county sheriffs "*[s]hall* keep and preserve the peace in their respective counties . . . and in apprehending or securing any person for felony or breach of the peace, they *may* call to their aid such persons, or power of their county as they may deem necessary."  (Emphasis added).  This provides the Sheriff with the discretion to call up deputies and other support staff, but it stops short of mandating such staffing with "precision and certainty."

32

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 55663-4-II

The McCartneys argue that the County has a "clear duty to maintain a safe workplace, but has taken no corrective action to prevent" McCartney's death. Br. of Appellant at 45. But as explained above, workplace safety laws do not define with specificity the number of sheriff deputies, type of training, or provide precise mandates on how to ameliorate the risks law enforcement officers face. The McCartneys do not fulfill the first element.

The McCartneys cannot fulfill the first element necessary for a court to issue a writ of mandamus. All three are required. *Colvin*, 195 Wn.2d at 894. Thus, we need not reach the remaining elements. Accordingly, we hold that the trial court did not err when it denied the writ.

VI.  FACTUAL DISPUTE: PUBLIC RECORDS

The McCartneys argue that the county public records the trial court took judicial notice of created genuine issues of material fact such that judgment on the pleadings under CR 12(c) was improper. We disagree.

As stated above, we review the trial court's ruling on a CR 12(c) motion de novo. *Aji P.*, 16 Wn. App. 2d at 187. We assume the truth of the facts alleged in the complaint and view them in the light most favorable to the nonmoving party. *Howell v. Dep't of Soc. & Health Servs.*, 7 Wn. App. 2d 899, 910, 436 P.3d 368 (2019).

The McCartneys do not argue that information in the public record contains disputed facts, but rather that the trial court improperly interpreted those records in the light most favorable to the County. But the McCartneys make no showing of this claim. The McCartneys once again argue that these records reveal that the County's decisions were not discretionary, high level policy determinations, but rather operational decisions not subject to discretionary immunity. However, the McCartneys do not cite examples of where such operational decisions

33

No. 55663-4-II

were made, and such claims are absent from the McCartneys' pleadings.  This argument fails.

Accordingly, we hold that the public records that the trial court took judicial notice of created no

genuine issue of material fact.

CONCLUSION

First, we hold that the trial court did not abuse its discretion when it took judicial notice

of public records of undisputed authenticity.  Next, we hold that the McCartneys' claims are

barred under governmental discretionary immunity and the professional rescuer doctrine.  We

further hold that a writ of mandamus is not appropriate because Pierce County's decisions on

allocation of funds for sheriff deputy staffing and geographic allocation are discretionary, and

not mandated with specificity in statute.  Finally, we hold that the public records created no issue

of material fact.  Thus, we hold that the trial court did not err when it entered judgment on the

pleadings.  We affirm.

Worswick, J.

We concur:

Lee, J.

Cruser, A.C.J.